[No. C053067. Third Dist. Feb. 1, 2008.]

GALLO CATTLE COMPANY, Plaintiff and Appellant, v.
A.G. KAWAMURA, as Secretary, etc., Defendant and Respondent.

**COUNSEL**

McCormick, Barstow, Sheppard, Wayte & Carruth, Marshall C. Whitney; and Brian C. Leighton for Plaintiff and Appellant.

Edmund G. Brown, Jr., Attorney General, Janet Gaard, Chief Assistant Attorney General, Mary E. Hackenbracht, Assistant Attorney General, Ellen M. Peter and Daniel M. Fuchs, Deputy Attorneys General; Linda Berg Gandara; and William A. Wineberg for Defendant and Respondent.

**OPINION**

**BUTZ, J.**—This case concerns the constitutionality, under the California Constitution's right to freedom of speech,[1] of use of milk producer assessments, authorized by statute, for generic advertising to stimulate sales of milk. The validity of such commodity advertising, under the federal Constitution, recently came before the United States Supreme Court in *Johanns v. Livestock*

---

[1] The California Constitution, article I, section 2, subdivision (a) states: "Every person may freely speak, write and publish his or her sentiments on all subjects, being responsible for the abuse of this right. A law may not restrain or abridge liberty of speech or press."

*Marketing Assn.* (2005) 544 U.S. 550 [161 L.Ed.2d 896, 125 S.Ct. 2055] (*Johanns*). We will decide to follow the reasoning in *Johanns* in applying the California Constitution's freedom of speech clause. We will also decide that the milk producer advertising program does not unconstitutionally compel speech because it uses a cheese package certification seal, a label that boosts sales only of cheese makers who agree to use it.

Gallo Cattle Company, a California limited partnership (Gallo), appeals from a judgment denying relief from milk production assessments, imposed by the California Department of Food and Agriculture (CDFA or the Department). The assessments are used in part to fund the "Real California Cheese" (a registered name) advertising campaign. The assessments are levied pursuant to a "marketing order" (Food & Agr. Code, § 58615)[2] issued by respondent A.G. Kawamura, Secretary of the CDFA (the Secretary), under the California Marketing Act of 1937 (§ 58601 et seq.). Gallo contends the trial court erred in finding that this use of the assessed funds is not a violation of its right to freedom of speech under the California Constitution, article I, section 2.

The trial court decided that the measure of the California Constitution free speech right is provided by *Johanns*. *Johanns* holds that where commodity advertising is authorized and the basic message is prescribed by statute and where its content is overseen and subject to the control of a politically accountable official, it is government speech. Furthermore, it holds that whether the funds for such advertising are raised by general taxes or through a targeted assessment, the taxpayers have no free speech right not to fund this government speech. (*Johanns, supra*, 544 U.S. at pp. 562–563 [161 L.Ed.2d at pp. 908–909].)

Gallo contends that (1) there are persuasive reasons not to adopt the rule of *Johanns* as the measure of the California Constitution's free speech right, and (2) in any event, its claim should be distinguished and upheld because Gallo is compelled by economic necessity to use the Real California Cheese certification seal on its cheese packages and thus, to voice the government speech to which it objects. These contentions are not meritorious and we shall affirm the judgment.

## FACTUAL AND PROCEDURAL BACKGROUND

Gallo has long engaged in the business of producing "market milk" (§ 32510) in Merced County. It, unlike the great majority of milk producers, also makes cheese. Gallo's cheese plant processes almost all of the milk it

---

[2] Undesignated statutory references are to the Food and Agriculture Code.

produces for cheese packaged for retail sales under the label "Joseph Farms." Gallo promotes itself as the "California Cheesemaker" and uses a registered trademark, "California Natural." Some kinds of Gallo cheese are sometimes imported from out-of-state vendors.

Gallo has paid to CDFA assessments prescribed under the "Marketing Order for Research, Education and Promotion of Market Milk and Dairy Products in California" (Milk Marketing Order) since it began dairy operations. At the time of trial, the assessment was $.10 per hundredweight of milk produced.

The Milk Marketing Order establishes an industry advisory board, the California Milk Producers Advisory Board (the Milk Board), composed of 24 members who are milk producers and one public member. The milk producer members are appointed by CDFA from persons nominated at annual regional district meetings of milk producers. The Milk Board, subject to the approval of CDFA, administers the Milk Marketing Order.

The Milk Board is authorized to develop recommendations of programs for CDFA approval for advertising and trade promotion relating to market milk and dairy products, including cheese. The programs must be directed toward increasing sale of milk products without reference to any private brand or trade name. However, promotions may use brand or trade names, when incidental to the promotion of California milk products and not in direct promotion of the brand or trade name. The majority of the annual budget of the Milk Board is spent promoting dairy products made from California milk.

We take a brief description of the promotional program in issue from *Gallo Cattle Co. v. California Milk Advisory Bd.* (9th Cir. 1999) 185 F.3d 969 (*Gallo I*), an earlier federal lawsuit between the parties:[3]

"Since its formation, [the Milk Board, hereafter in this excerpt CMAB] has conducted an integrated program for the promotion of milk and dairy products which includes advertising, merchandising, public relations, education and research. CMAB spends the majority of its annual budget promoting dairy products made from raw milk (such as fluid milk, cream, butter, cottage cheese, yogurt, cheese and ice cream). In doing so, CMAB attempts to increase the demand for milk produced by the California dairy farmers

"In the early 1980's, CMAB sponsored a task force designed to expand the then fledgling cheese industry in California. After determining that the vast

---

[3] In *Gallo I*, Gallo alleged that the Milk Board's "compulsory assessments for the promotion and advertising of California milk and dairy products violate Gallo's First Amendment rights." (*Gallo I, supra,* 185 F.3d at p. 970.) The pre-*Johanns* First Amendment challenge was rejected on summary judgment, upheld on the view the "Marketing Order is a species of economic regulation that does not abridge Gallo's First Amendment rights." (*Gallo I,* at p. 977.)

majority of cheese sold in California was imported and therefore not produced with California milk, CMAB began a campaign to reverse this trend. One of the steps CMAB took to further this campaign was the development of the Real California Cheese® seal as a certification mark.[4]

"CMAB licenses this seal, free of charge and on a nondiscriminatory basis, to all manufacturers of cheese on the condition that the cheese was manufactured from California milk, that it contains no preservatives and that it meets minimal quality standards prescribed by law. (*See* CMAB 'Real California Cheese' Seal Certified User Agreement.) CMAB then seeks to generate demand for cheese, either branded or private label, which voluntarily carries the seal on its package. Consumer demand is created through various promotional activities including television, newspaper and billboard advertising; point-of-sale material in grocery stores; coupons; and in-store demonstrations and tastings in which all cheese bearing the seal in a particular store may participate.

"By creating a demand for cheese bearing the Real California Cheese® seal, CMAB seeks to increase the demand for California raw milk by persuading cheese manufacturers to purchase raw milk from California dairy farmers, and by persuading retail outlets to purchase and offer for sale cheese produced from California milk. The beneficiaries of this effort are the dairy farmers of California who pay the assessment and who produce and sell the raw milk that is the principal ingredient of Real California Cheese®.[5]" (*Gallo I, supra*, 185 F.3d at p. 971 & fns. 3 & 4.)

This ends our account of the Real California Cheese program from *Gallo I.*

Gallo does not take issue with the trial court's resolution of issues of the Milk Board's status as a government entity and CDFA's control of the advertising and promotions. The trial court found, in pertinent part: (1) the advertising program in issue is authorized and the basic message is prescribed by statute; (2) the responsible administrative official is a politically accountable official, the Secretary of the CDFA; (3) the Secretary appoints the members of the Milk Board pursuant to statute; (4) the Secretary is responsible for the preparation, issuance, administration and enforcement of plans for promoting the sale of any commodity and has the final power to consider and approve any programs of advertising and trade promotion developed by

---

[4] "A certification mark is a federally registered trademark which certifies that the product bearing the mark meets certain standards. (*See* 15 U.S.C. § 1127.)" (*Gallo I, supra*, 185 F.3d at p. 971, fn. 3.)

[5] "In fact, the milk producers benefit tenfold from increased consumption of cheese produced from California raw milk because it takes ten pounds of raw milk to make one pound of cheese." (*Gallo I, supra*, 185 F.3d at p. 971, fn. 4.)

the Milk Board; (5) the Secretary or his official representatives exercise final approval over the specific content of all promotional campaigns carried out under the Milk Marketing Order; (6) all proposed promotional messages were reviewed by representatives of CDFA for both substance and wording, and no message was disseminated without Department approval; (7) some proposals were rejected or rewritten by or at the behest of Department representatives, or, in particular cases, by the Secretary himself; and (8) representatives of the Department regularly both attend and participate in meetings in which proposals are developed and reviewed, and frequently offer feedback on the creative content of the proposed advertising campaigns.

In the portion of its statement of decision concerning the issue of disclosure of government sponsorship in the challenged advertising campaign, the trial court observed the following: Some of the advertisements contain no language identifying the sponsor as the Milk Board or the State of California or any department or agency of the state. Some advertisements did contain language identifying the Milk Board as the sponsor of the message. Recent television advertisements have included taglines identifying the Board as an instrumentality of the State of California. The taglines appear very briefly in the advertisements, too briefly to alert the average viewer to the fact that the commercials are being presented on behalf of a government agency.

## DISCUSSION

### I. *Johanns* Applies to Free Speech Rights Under the California Constitution, Article I, Section 2

Gallo first contends that the trial court erred in accepting the reasoning of *Johanns, supra,* 544 U.S. 550 [161 L.Ed.2d 896] for use in resolving free speech issues arising under the California Constitution. Gallo notes that the California Supreme Court has at times departed from federal doctrine concerning free speech in applying California Constitution, article I, section 2. Gallo argues that there are persuasive reasons for taking a different course on this issue. We do not find the reasons Gallo offers persuasive and find no merit in the contention of error.

#### A. *Case Law on Freedom of Speech Infringement Arising from Compulsory Fees Used to Fund Speech*

The United States Supreme Court has led the way in developing a doctrine of freedom of speech infringement arising from compulsory fees used to fund speech. In *Abood v. Detroit Board of Education* (1977) 431 U.S. 209 [52 L.Ed.2d 261, 97 S.Ct. 1782] (*Abood*) and then *Keller v. State Bar of California* (1990) 496 U.S. 1 [110 L.Ed.2d 1, 110 S.Ct. 2228] (*Keller*), the

high court invalidated the use of the compulsory fees to fund union and bar speech, respectively, on political matters not germane to the regulatory interests that justified compelled membership. The application of these landmark precedents to a compelled subsidy of commodity advertising has not been smooth sailing.

The high court's first foray into the waters of the compulsory subsidy of commodity advertising was in *Glickman v. Wileman Brothers & Elliott, Inc.* (1997) 521 U.S. 457 [138 L.Ed.2d 585, 117 S.Ct. 2130] (*Glickman*). In *Glickman*, the court majority found no First Amendment violation in compulsory fees for generic advertising under a federal marketing order that regulated nectarines, peaches, pears, and plums grown in California.[6] The majority decided "assessments to fund a lawful collective program may sometimes be used to pay for speech over the objection of some members of the group." (*Glickman*, at pp. 472–473 [138 L.Ed.2d at p. 602].) Specifically, "the generic advertising of California peaches and nectarines is unquestionably germane to the purposes of the marketing orders and, . . . in any event, the assessments are not used to fund ideological activities." (*Id.* at p. 473 [138 L.Ed.2d at p. 602].) The rationale was: "In sum, what we are reviewing is a species of economic regulation that should enjoy the same strong presumption of validity that we accord to other policy judgments made by Congress." (*Id.* at p. 477 [138 L.Ed.2d at p. 604].)

The high court's second foray into this area was in *United States v. United Foods, Inc.* (2001) 533 U.S. 405 [150 L.Ed.2d 438, 121 S.Ct. 2334]. The majority concluded that *Abood* and *Keller* were controlling and that a mandatory assessment for generic mushroom advertising violated the First Amendment. (*United Foods*, at pp. 413–414 [150 L.Ed.2d at pp. 446–447].) *Abood* and *Keller* would permit the mandatory fee if it were "germane" to a "broader regulatory scheme," however, the court in *United Foods* held (unlike the more complex scheme of *Glickman*) that the *only* regulatory purpose was funding the very advertising scheme in question. The claim that the advertising in issue was government speech, and so immune from the scrutiny that would otherwise apply, was raised when the matter came before the Supreme Court. However, the court declined to consider the claim as untimely. (*United Foods*, at pp. 416–417 [150 L.Ed.2d. at pp. 448–449].)

---

[6] The government speech issue was eschewed. In a footnote, the *Glickman* dissent acknowledged: "The Secretary of Agriculture does not argue that the advertisements at issue represent so-called 'government speech,' with respect to which the Government may have greater latitude in selecting content than otherwise permissible under the First Amendment, see *Keller*[, *supra*,] 496 U.S. [at pp.] 10–13 [110 L.Ed.2d [at pp. 11–14]]; *Abood*[, *supra*,] 431 U.S. [at p.] 259, fn. 13 [52 L.Ed.2d [at p. 299, fn. 13]] (Powell, J., concurring in judgment). See Brief for Petitioner 25, [fn.] 16 (waiving argument))." (*Glickman, supra*, 521 U.S. at p. 482, fn. 2 [138 L.Ed.2d at p. 607, fn. 2] (dis. opn. of Souter, J.).)

In *Johanns* the court revisited the question from the omitted analytic perspective of government speech. "[T]he dispositive question is whether the generic advertising at issue is the Government's own speech and therefore is exempt from First Amendment scrutiny." (*Johanns, supra,* 544 U.S. at p. 553 [161 L.Ed.2d at p. 902].) The answer of the *Johanns* majority is, yes. As a result, although the beef program in issue in *Johanns* closely resembles the generic mushroom program overturned in *United Foods* (*Johanns,* at p. 555 [161 L.Ed.2d at p. 904]), the court majority in *Johanns* came to the opposite conclusion.[7]

The *Johanns* majority opinion delineates "two categories of cases: true 'compelled-speech' cases, in which an individual is obliged personally to express a message he disagrees with, imposed by the government; and 'compelled-subsidy' cases, in which an individual is required by the government to subsidize a message he disagrees with . . . ." (*Johanns, supra,* 544 U.S. at p. 557 [161 L.Ed.2d at p. 905].) It then notes: "We have not heretofore considered the First Amendment consequences of government-compelled subsidy of the government's own speech." (*Ibid.*)

As related, *Johanns* holds that where commodity advertising is authorized and the basic message is prescribed by statute and where its content is overseen and subject to the control of a politically accountable official, it is government speech. Furthermore, it holds that whether the funds for such promotions are raised by general taxes or through a targeted assessment, citizens have no free speech right not to fund such government speech. (*Johanns, supra,* 544 U.S. at pp. 562–563 [161 L.Ed.2d at p. 908].)

The California Supreme Court has tracked this federal case law on tacks of its own. In *Gerawan Farming, Inc. v. Lyons* (2000) 24 Cal.4th 468 [101 Cal.Rptr.2d 470, 12 P.3d 720] (*Gerawan I*), our Supreme Court declined to follow *Glickman* as to free speech rights under the California Constitution in a case addressing a plum marketing program under a California marketing order. The *Gerawan I* majority opinion rejected so applying the rationale in *Glickman:* "[T]he *Glickman* majority's analysis results from, and results in, the proposition that the First Amendment's right to freedom of speech does not protect commercial speech against compelled funding. Any such proposition is simply untenable with respect to article I's [free speech clause]. The *Glickman* majority found 'no . . . right' whatsoever under the First Amendment 'to be free of coerced subsidization of commercial speech.' (*Glickman*[*, supra,*] 521 U.S. at p. 477 [138 L.Ed.2d at p. 605] (dis. opn. of Souter, J.).)

---

[7] See also, e.g., *Paramount Land Co. LP v. Cal. Pistachio Comm'n* (9th Cir. 2007) 491 F.3d 1003, 1010–1011 (The California Pistachio Act of 1980, sections 69001–69114, administered by the California Pistachio Commission, compelling California pistachio growers to fund generic advertising through the commission, does not violate the First Amendment).

We cannot so find under article I." (*Gerawan I*, 24 .Cal.4th at p. 514.) However, the court did not hold that the marketing program actually resulted in a violation under the California Constitution.

"Our conclusion, however, brings no conclusion to this cause. That the California Plum Marketing Program implicates Gerawan's right to freedom of speech under article I does not mean that it violates such right. But it does indeed raise the question. That question, in turn, raises others, including what test is appropriate for use in determining a violation. And *that* question, in *its* turn, raises still others as well, including what protection, precisely, does article I afford commercial speech, at what level, of what kind, and, perhaps 'most difficult,' subject to what test (*Spiritual Psychic Science Church v. City of Azusa* [(1985)] 39 Cal.3d [501,] 513 [217 Cal.Rptr. 225, 703 P.2d 1119][, disapproved in part on a different ground in *Kasky v. Nike, Inc.* (2002) 27 Cal.4th 939, 968 [119 Cal.Rptr.2d 296, 45 P.3d 243]]). To address such questions belongs, in the first instance, to the Court of Appeal on remand. It did not reach beyond the issue whether the California Plum Marketing Program implicates Gerawan's right to freedom of speech under article I when the cause was before it originally." (*Gerawan I, supra*, 24 Cal.4th at p. 517.)

The case returned to the California Supreme Court in *Gerawan Farming, Inc. v. Kawamura* (2004) 33 Cal.4th 1 [14 Cal.Rptr.3d 14, 90 P.3d 1179] (*Gerawan II*). The majority opinion made the following dispositions: "The Court of Appeal concluded that the program to which plaintiff Gerawan Farms, Inc. (Gerawan), objected was unconstitutional because, as discussed below, it was not supported by a valid government interest, owing to the fact that it had to be approved by a private association. We granted review specifically to assess the validity of this holding and more generally to address the constitutional questions remaining from *Gerawan I*. We conclude the compelled funding of generic advertising in this case should be tested by the intermediate scrutiny standard articulated by the United States Supreme Court in *Central Hudson Gas & Elec. v. Public Serv. Comm'n* (1980) 447 U.S. 557 [65 L.Ed.2d 341, 100 S.Ct. 2343] (*Central Hudson*), and that remand for further factfinding is required to determine whether the program at issue is constitutional. We conclude as well the Secretary of Food and Agriculture's (Secretary) claim that the generic advertising in question is constitutional because it is government speech also cannot be resolved on the pleadings and requires further factfinding." (*Gerawan II*, at p. 6.)

The majority opinion makes the following salient observations about the lattermost question: "In the present case, the marketing board is comprised of and funded by plum producers, and is in that respect similar to the State Bar. But, as *United Foods* suggests, the speech may nonetheless be considered

government speech if in fact the message is decided upon by the Secretary or other government official pursuant to statutorily derived regulatory authority. Because there are factual questions that may be determinative of the outcome—for example, whether the Secretary's approval of the marketing board's message is in fact pro forma, whether the marketing board is in de facto control of the generic advertising program, and whether the speech is attributed to the government—this issue cannot be resolved on the pleadings and requires further factfinding." (*Gerawan II, supra,* 33 Cal.4th at p. 28.)

### B. Gallo Presents No Persuasive Reasons for Taking a Different Course from Johanns

■ *Gerawan I* follows the reasoning in *People v. Teresinski* (1982) 30 Cal.3d 822 [180 Cal.Rptr. 617, 640 P.2d 753] (*Teresinski*) for determining whether to follow the United States Supreme Court in matters concerning free speech doctrine. (*Gerawan I, supra,* 24 Cal.4th at pp. 510–513.) "Decisions of the United States Supreme Court, nevertheless, are entitled to respectful consideration [citations] and ought to be followed unless persuasive reasons are presented for taking a different course." (*Teresinski, supra,* 30 Cal.3d at p. 836.) The *Teresinski* opinion recites four categories of potential sources of such persuasive reasons: (1) something "in the language or history of the California provision suggests that the issue before us should be resolved differently than under the federal Constitution" (*ibid.*); (2) "the high court 'hands down a decision which limits rights established by earlier precedent in a manner inconsistent with the spirit of the earlier opinion' " (*ibid.*); (3) there are vigorous "dissenting opinions [or] incisive academic criticism of those decisions" (*ibid.*); or (4) following the federal rule would "overturn established California doctrine affording greater rights" (*id.* at p. 837). Gallo argues that we should reject the *Johanns* view because there are persuasive reasons in each *Teresinski* category to take a different course. Gallo's arguments are not persuasive.

1. *No persuasive reasons arise under either the first or fourth* Teresinski *categories.*

   a. *The language and history of the California free speech provision do not suggest that* Johanns *should be rejected.*

As to the language and history of the California provision, Gallo submits that the reasoning in *Gerawan I* weighs in its favor. Gallo points to the assertion in the majority opinion that "practically *everything* in [the California provision's] language and history mandates a different resolution." (*Gerawan I, supra,* 24 Cal.4th at p. 512.) However, "different resolution" in that context only meant different from *Glickman's* view that the right to

freedom of speech was not "implicated" by a commodity assessment for generic advertising. There is no analogy between the threshold issue of "implication of free speech" in *Gerawan I* and the issues concerning "government speech" doctrine in this case.

"All the court held in *Gerawan I* is that a program that requires agricultural producers to fund nongovernmental commercial speech *implicates* article I's free speech clause, and that a court must conduct some unspecified inquiry into whether the program violates that clause. Although the *Gerawan I* court engaged in a general historical discussion, quoted in part above, in support of the position that compelled subsidization of commercial speech implicates the free speech clause (*Gerawan I, supra,* 24 Cal.4th at pp. 494–497), no specific constitutional test can be derived from that discussion" (*Gerawan II, supra,* 33 Cal.4th at p. 16).

Gallo argues that the history of the California provision suggests that the issue before us should be resolved differently because in a footnote[8] in *Gerawan I* the majority observed that "government speech" means speech concerning public affairs and suggested that term does not appear to cover generic advertising under a marketing order. (*Gerawan I, supra,* 24 Cal.4th at p. 503.) However, this passing remark cannot count as a contrary history of interpreting the California provision. It is supported solely by citation of federal authorities and the *Gerawan I* opinion expressly eschews a resolution of the question soon thereafter in a subsequent footnote.[9] Moreover, as

---

[8] Footnote 8 of *Gerawan I* states as follows: "Without contradiction by the *Glickman* majority, Justice Souter noted that generic advertising under Marketing Order No. 917 did not 'represent so-called "government speech," with respect to which the Government may have greater latitude in selecting content than otherwise permissible under the First Amendment . . . .' ([*Glickman*], *supra,* 521 U.S. at p. 482, fn. 2 [138 L.Ed.2d at p. 607, fn. 2] (dis. opn. of Souter, J.).) [This assertion about the *Glickman* dissent is incorrect; compare the text of the footnote, cited at fn. 6, *ante.*] 'Government speech' is, somewhat tautologically, speech by the government itself concerning public affairs. (See [*Keller*], *supra,* 496 U.S. at p. 10 [110 L.Ed.2d at p. 12]; [*Abood*], *supra,* 431 U.S. at p. 259, fn. 13 [52 L.Ed.2d at p. 299, fn. 13] (conc. opn. of Powell, J.).) It does not appear to cover generic advertising under a federal marketing order, which is not so much a mechanism of regulation of the producers and handlers of an agricultural commodity by a governmental agency, as a mechanism of self-regulation by the producers and handlers themselves." (*Gerawan I, supra,* 24 Cal.4th at p. 503, fn. 8.)

[9] Footnote 13 of *Gerawan I* states: "Whether, and how, article I's free speech clause may accommodate government speech (see *ante,* at p. 502, fn. 8) is a question that we need not, and do not, answer. In its amended complaint, Gerawan did not allege facts that would show that generic advertising under the California Plum Marketing Program—which is not so much a mechanism of regulation of the producers and handlers of an agricultural commodity by a governmental agency, as a mechanism of self-regulation by the producers and handlers themselves—amounts to speech of this sort. Neither did the Secretary of Food and Agriculture so claim in his motion for judgment on the pleadings. At oral argument, counsel for certain of

related, the question is expressly left open in *Gerawan II, supra*, 33 Cal.4th at page 28. (See pp. 958–959, *ante.*)

There is no persuasive reason arising from the language or history of the California provision impelling a different resolution from that under the federal Constitution.

  b.  *No established California doctrine suggests that* Johanns *should be rejected.*

A fortiori, Gallo's argument, under the related fourth *Teresinski* category, that following *Johanns* would overturn established California doctrine affording greater rights, is unsupported. There is no established California doctrine affording greater rights.

2.  Johanns *does not limit rights established by earlier precedent.*

Gallo argues that *Johanns* should be rejected under the second *Teresinski* category because it presents a departure from precedent. The rationale for the second *Teresinski* category is to avoid abandoning " 'settled applications' " of the terms of the California Constitution " 'every time changes are announced in the interpretation of the federal charter.' " (*Teresinski, supra*, 30 Cal.3d at p. 836, quoting *People v. Pettingill* (1978) 21 Cal.3d 231, 248 [145 Cal.Rptr. 861, 578 P.2d 108].) The short, unsettled case law history of the application of the free speech provisions to assessments for generic advertising under marketing orders belies the notion that *Johanns* overturns settled law. There is no prior holding concerning the application of the government speech doctrine. This area of the law is a frontier and the second *Teresinski* category is inapplicable.

3.  *There is a dissenting opinion in and academic criticism of* Johanns; *however, we find their reasoning unpersuasive.*

That brings us to the remaining *Teresinski* category, dissenting opinions and academic criticism. Dissenting opinions and academic criticism *may* be a source of persuasive reasons not to follow the federal rule: "[W]e have on occasion been influenced not to follow parallel federal decisions by the vigor of the dissenting opinions and the incisive academic criticism of

the amici curiae supporting the secretary's position attempted to raise the point. Too little, too late." (*Gerawan I, supra*, 24 Cal.4th at p. 515, fn. 13.)

those decisions." (*Teresinski*, 30 Cal.3d at p. 836.) What is dispositive is whether the reasoning in the dissenting opinions and academic criticism is persuasive.[10]

Gallo argues, perforce, that this court should reject the view of the *Johanns* majority opinion and adopt the view of the principal dissenting opinion and its academic supporters. That dissenting opinion concludes that in order to render compelled subsidy of generic commodity advertising constitutional, the advertising must be explicitly labeled as coming from the government. (*Johanns*, *supra*, 544 U.S. at pp. 575–580 [161 L.Ed.2d at pp. 916–919] (dis. opn. of Souter, J.).)

The *Johanns* dissent reasons as follows: There is a First Amendment interest in avoiding forced subsidies. As to government speech, that interest is ordinarily satisfied because the political process serves as a check on what government chooses to say. Government speech funded by a targeted assessment is more galling to those offended in the targeted group than is the case when the subsidy is more remotely shared by every taxpayer. Because of the closer linkage, government speech funded by a targeted assessment impinges more acutely on the presumptive autonomy as speakers of those who fund that speech. Hence, greater care is required to assure that the speech is subject to effective democratic checks. A practical opportunity for political response requires that the ads so funded disclose they are speech by the government. (*Johanns*, *supra*, 544 U.S. at pp. 575–579 [161 L.Ed.2d at pp. 916–919].)

█ The *Johanns* majority opinion replies as follows: "The dissent cites no prior practice, no precedent, and no authority for this highly refined elaboration—not even anyone who has ever before thought of it. It is more than we think can be found within 'Congress shall make no law . . . abridging the freedom of speech.' " (*Johanns, supra*, 544 U.S. at p. 564, fn. 7 [161 L.Ed.2d at p. 909, fn. 7].) "The [free speech precept] does not confer a right to pay one's taxes into the general fund, because the injury of compelled funding (as opposed to the injury of compelled speech) does not stem from the Government's mode of accounting." (*Id.* at pp. 562–563 [161 L.Ed.2d at p. 908].) The dissent's reliance on the presumptive autonomy of assessment payers as speakers conflates an interest in avoiding attribution of the speech with an interest in avoiding paying for speech of the government. "Apportioning the burden of funding government operations (including speech) through taxes and other levies does not violate autonomy simply because

---

[10] Gallo does not relate reasoning in the academic criticism to which it points, that provides grounds for rejecting *Johanns* beyond those in the dissenting opinion of Justice Souter. Accordingly, we provide no separate discussion of the academic literature.

individual taxpayers feel 'singled out' or find the exaction 'galling.' " (*Id.* at p. 565, fn. 8 [161 L.Ed.2d at pp. 909–910, fn. 8].)

We find the reasoning of the *Johanns* majority more persuasive than Justice Souter's dissent. We do not agree that the posited threat of a greater likelihood of outrage and intemperate response warrants creation of a novel special disclosure requirement. If explicit disclosure ought to be required by the free speech interest, so that government speech is subject to the check of the political process, then it ought to be required across the board. We are also skeptical that such a special disclosure requirement would, as a practical matter, provide a significantly greater assurance that such speech will be subject to effective democratic checks.

In our judgment, the taxpayer's autonomy interest is correctly addressed by the *Johanns* majority as a factual question of misattribution. "Whether the *individual* respondents who are beef producers would be associated with speech labeled as coming from 'America's Beef Producers' is a question on which the trial record is altogether silent. We have only the funding tagline itself, a trademarked term that, standing alone, is not sufficiently specific to convince a reasonable factfinder that any particular beef producer, or all beef producers, would be tarred with the content of each trademarked ad." (*Johanns, supra,* 544 U.S. at p. 566 [161 L.Ed.2d at p. 910], fn. omitted.) If the injury is misattribution, the remedy should be to correct the misattribution and to remedy the damage, if any, attributable to the misattribution.

For all the foregoing reasons, the trial court did not err in accepting the reasoning of *Johanns* for use in resolving free speech issues arising under the California Constitution.

## II. The Use of a Package Certification Seal Does Not Render a Marketing Order Advertising Program Unconstitutional by Compelling Speech

Gallo contends that the trial court erred in failing to grant it relief, regardless of acceptance of *Johanns*. Gallo submits that the Real California Cheese package certification seal component of the advertising program renders it unconstitutional, in any event. Gallo argues that the package certification seals or labels make this a true case of compelled speech rather than one of mere compelled subsidy. Gallo acknowledges that it is not legally compelled to carry the Real California Cheese certification seals on its cheese

packages. However, Gallo asserts that it is "economically compelled" to do so, and that compulsion renders the promotion campaign unconstitutional.[11]

Gallo objects to the Real California Cheese message because it suggests all cheeses made from California milk are equally good. Gallo asserts it participates in such programs to "recoup" the milk assessment money it pays to CDFA. Gallo would rather have that money to advertise its own cheese as superior. Gallo asserts that the generic Real California Cheese seal gives the advertising advantages of a Real California Cheese "brand" to competing store-brand cheeses. Gallo claims that it is "compelled" to carry the Real California Cheese seal with the Milk Board's message or it will lose shelf space to store-brand cheeses. Gallo also complains that it cannot participate in in-store promotion events subsidized by the Milk Board unless it uses the Real California Cheese seal on its cheese packages.

Gallo points to the following passage in the majority opinion in *Gerawan I* for validation of its claim of harm. "By way of illustration, when some producers, like Gerawan, develop and use brands in marketing their goods, and others do not, the former may find themselves disadvantaged by generic advertising in their competition against the latter. Generic advertising may portray goods as 'indistinctive' in spite of brand, and may thereby 'minimize[] consumer desire to distinguish' *inter se*. (Comment, *The Effect of Glickman v. Wileman Brothers & Elliott, Inc. on Nongeneric Commodities: A Narrow Focus on a Broad Rule* (1999) 9 San Joaquin Agr. L.Rev. 95, 113.) Even when no producers develop or use brands in marketing their goods, some may find themselves disadvantaged by generic advertising in their competition against others. Generic advertising can be manipulated to serve the interests of some producers rather than others, as by allowing some to develop a kind of brand by means of funds assessed from all and then use it for their own exclusive benefit. Thus, in any given case, a producer who objects to generic advertising may not be attempting to ride free on the funds of others—a familiar charge—but may merely be making an effort to prevent

---

[11] Gallo also argues that the trial court erred prejudicially in failing to make certain "findings" addressing this issue in the statement of decision. The trial court is required upon appropriate request to issue a statement of decision explaining the factual and legal basis for its decision as to each of the principal controverted issues. (Code Civ. Proc., § 632.) If the trial court fails to resolve a controverted issue and the record shows that the omission or ambiguity was properly brought to the attention of the trial court, the appellate court may not draw factual inferences in support of the judgment. (Code Civ. Proc., § 634.) However, where the disposition of an issue turns entirely on legal conclusions, a complaint of insufficiency of the trial court's statement of the legal basis for its decision is unavailing unless the appellant's legal theory that the judgment is infirm is correct. (See 7 Witkin, Cal. Procedure (4th ed. 1997) Trial, § 398, subd. (c), p. 459.) Here, as we explain in the text, Gallo's legal theory, that the economic incentive to use of the Real California Cheese seal on its packaging results in compelled speech, is incorrect.

others from hijacking his own funds as they drive to their own destination." (*Gerawan I, supra,* 24 Cal.4th at p. 504.)

We note, preliminarily, that in this case there is no indication that the Milk Board's generic advertising was manipulated by Gallo's competitors to disadvantage Gallo. Most milk producers are not cheese makers; their only discernible aim in adopting the Real California Cheese program is to create greater demand for milk. Nor is it the case that the brandlike characteristics of the program are designed to be used for the exclusive benefit of a subgroup of milk producers or cheese makers. All cheese makers are eligible for the benefits of the program.

■ More to the point, whether the resulting effects of a government program intervening in the economy are unfair, too unfair, or unfair enough to override the resulting advantages, is ordinarily a question of public policy assigned to the Legislature. (See, e.g., *Glickman, supra,* 521 U.S. at pp. 475–476 [138 L.Ed.2d at pp. 603–604].) Here, however, Gallo seeks to use its claim of unfairness on the constitutional plane, to preclude legislative choice whether to adopt or continue such a marketing order program. Thus the question is not whether Gallo suffers a disadvantage if it declines use of the Real California Cheese seal. It is, rather, whether such a disadvantage is cognizable for purposes of making out a compelled speech claim. (See, e.g., *Warner Cable Communications v. City of Niceville* (11th Cir. 1990) 911 F.2d 634, 638 ["A City-owned cable system, if successful, will no doubt reduce the audience for Warner's speech and diminish the profitability of that speech. Such economic loss, however, does not constitute a *first amendment injury*."].)

■ Gallo notes the general doctrine that government benefits cannot be denied on the basis of the exercise of freedom of speech. (See, e.g., *Perry v. Sindermann* (1972) 408 U.S. 593 [33 L.Ed.2d 570, 92 S.Ct. 2694] [public employment cannot be denied in retaliation for the exercise of the constitutional right of free speech]; *Healy v. James* (1972) 408 U.S. 169 [33 L.Ed.2d 266, 92 S.Ct. 2338] [school cannot deny campus recognition to organization based on radical advocacy].) Gallo also notes various statements in free speech case law on the theme that "governmental action may be subject to constitutional challenge even though it has only an indirect effect on the exercise of First Amendment rights." (*Laird v. Tatum* (1972) 408 U.S. 1, 12–13 [33 L.Ed.2d 154, 163, 92 S.Ct. 2318] [holding there is no standing to claim chilling effect of Army surveillance of " 'lawful and peaceful civilian political activity' " unless surveilled (*id.* at p. 2 [33 L.Ed.2d at p. 157])]; see also *American Communications Assn. v. Douds* (1950) 339 U.S. 382, 402 [94 L.Ed. 925, 946, 70 S.Ct. 674] ["indirect 'discouragements' undoubtedly have the same coercive effect upon the exercise of First Amendment rights as imprisonment, fines, injunctions or taxes . . ."].)

The meaning of these general pronouncements about an indirect effect on the exercise of First Amendment rights is provided by their application to facts. None of the cases Gallo cites provides an example of indirectly compelled speech that is analogous to this case. Here the government benefits are not denied in retaliation for, or to discourage or penalize, the exercise of the constitutional right of free speech.

If the government offers to pay for advertising, say for military recruitment, a media outlet can decline to place the ad on the ground it does not like the content. However, it cannot prevent any such government advertising with which it disagrees or demand a refund of a ratable portion of its taxes based on a free speech claim. Refusing to pay for government advertising unless it is run is not "economic compulsion" unconstitutionally compelling speech. (Cf. *Rust v. Sullivan* (1991) 500 U.S. 173 [114 L.Ed.2d 233, 111 S.Ct. 1759] [regulations prohibiting those who take federal clinic money from engaging in abortion counseling do not infringe freedom of speech].)

Gallo's core claim is analogous to that of a media outlet that cannot get paid unless it publishes the government speech. It can only derive the full benefit of the Real California Cheese advertising if it uses the Real California Cheese label on its packages. Brands, trademarks, and slogans are the staple of advertising, devices to build positive associations with products. You cannot get the full benefit of product advertising unless you use them in point-of-sale materials. If the government is not permitted to use these devices, it is effectively prohibited from "government speech" of this nature.

Gallo's compelled speech claim is that the government must give up the Real California Cheese package certification seal or Gallo must be relieved of the obligation as a milk producer to pay its milk assessments, so that it can pursue its own advertising strategy. This, in effect, would require the government to fund Gallo's speech. That is not a viable constitutional claim. The government may choose to fund only its viewpoint when the government is itself the speaker or uses private speakers to transmit specific information pertaining to its own program. (See, e.g., *Legal Services Corporation v. Velazquez* (2001) 531 U.S. 533, 541 [149 L.Ed.2d 63, 72, 121 S.Ct. 1043].)

■ Gallo submits that the assessment program funding of the Real California Cheese message unconstitutionally "drowns out" its branded message that its cheese is superior, citing *R.J. Reynolds Tobacco Co. v. Shewry* (9th Cir. 2005) 423 F.3d 906, 923. However, that doctrine requires that the government speak in such a way as to make private speech difficult or impossible, such that opponents do not truly have the opportunity to communicate their views even to those who might wish to hear them. (*Ibid.*) Gallo concedes it could disclaim the imputed Real California Cheese message that

all cheese made from California milk is equal in its own advertisements and speech. As Gallo offers no reason why the Real California Cheese seal makes it difficult or impossible to communicate its own message, that Gallo cheese is the best of the lot, its "drowning out" claim is unpersuasive.

Gallo suggests that this is a special case because its own money, assessed against it as a milk producer, has been used to create an advantage for competing cheese makers. However, the source of the funding, whether limited assessment or general taxation, has no bearing on whether elective speech taking commercial advantage of the positive associations of the funded advertising is compelled speech. (See *Glickman, supra,* 521 U.S. at p. 470 [138 L.Ed.2d at p. 600].)[12] Most cheese makers are not milk producers. An ordinary cheese maker does not directly pay a milk producer assessment. However, presumably that cost is passed on to the cheese maker as a milk buyer, in the production cost of California milk. A compelled speech claim of such a cheese maker based on the inducement to use the Real California Cheese seal is, in principle, equal to that of Gallo's claim.

Gallo also complains that participation in advantageous in-store promotions under the Real California Cheese seal are limited to cheese packaged to carry the Real California Cheese certification seal. However, this is no more offensive than that Gallo cannot get the full benefit of the program without the label. In-store promotions are an ordinary part of an integrated advertising campaign to build positive associations to increase aggregate sales. If you are eligible and want to participate you may do so. If not, you cannot garner the positive associations of the advertising program. For the reasons already given, we see no reason grounded in the constitutional free speech doctrine to preclude the government from using this device.

▇▇ The trial court did not err in failing to hold the assessment program is unconstitutional on the ground that the Real California Cheese certification seal component economically compels Gallo to voice a message with which it disagrees.

---

[12] *Glickman* provides: "Respondents argue that the assessments for generic advertising impinge on their First Amendment rights because they reduce the amount of money that producers have available to conduct their own advertising. This is equally true, however, of assessments to cover employee benefits, inspection fees, or any other activity that is authorized by a marketing order. The First Amendment has never been construed to require heightened scrutiny of any financial burden that has the incidental effect of constraining the size of a firm's advertising budget. The fact that an economic regulation may indirectly lead to a reduction in a handler's individual advertising budget does not itself amount to a restriction on speech." (*Glickman, supra,* 521 U.S. at p. 470 [138 L.Ed.2d at p. 600].)

## DISPOSITION

The judgment is affirmed. Respondent shall recover its costs on appeal. (Cal. Rules of Court, rule 8.278(a)(1).)

Robie, Acting P. J., and Cantil-Sakauye, J., concurred.

Appellant's petition for review by the Supreme Court was denied May 14, 2008, S161708. Kennard, J., and Werdergar, J., were of the opinion that the petition should be granted.