[No. D053644. Fourth Dist., Div. One. Nov. 10, 2009.]

MICHAEL KAYE, Plaintiff and Appellant, v.
BOARD OF TRUSTEES OF THE SAN DIEGO COUNTY PUBLIC LAW
LIBRARY et al., Defendants and Respondents.

50

**COUNSEL**

Michael Kaye, in pro. per., for Plaintiff and Appellant.

Andrews • Lagasse • Branch & Bell, Margaret C. Bell and Shauna L. Durrant for Defendants and Respondents.

## OPINION

## McCONNELL, J.—

### INTRODUCTION

A former law librarian whose employer discharged him after he sent a scathing e-mail criticizing his superiors appeals the trial court's decision to grant summary adjudication as to the state law causes of action in his wrongful termination action. We conclude the granting of summary adjudication was proper under the circumstances and affirm the judgment.

### I

### FACTUAL AND PROCEDURAL BACKGROUND

In late February 2006,[1] a representative from the Administrative Office of the Courts (AOC) contacted the San Diego County Public Law Library (Library) seeking a panel member for a program about helping self-represented litigants with appeals. The program was part of an AOC conference on self-represented litigants. A Library staff member referred the representative to Michael Kaye, a reference librarian who taught the Library's appellate course for self-represented litigants. The AOC representative asked Kaye to be a panel member. Because Kaye's supervisor, Joan Allen-Hart, was on sick leave that week, Kaye requested permission to participate in the program from Robert Riger, the Library's director and Allen-Hart's supervisor. Riger immediately approved Kaye's request. Riger was also attending the conference, but planned to leave midmorning on the last day.

When Allen-Hart learned of the invitation, she questioned its genesis and why, as a matter of protocol, it had not been routed through her or Riger first. Riger directed Gail Lawrence, the Library's financial officer, to inquire further into the matter. Upset by the inquiry, Kaye rescinded his acceptance.

Around this same time, Allen-Hart sent an e-mail to Kaye and the other full-time reference librarians announcing an upcoming staff meeting and listing several anticipated discussion topics. In addition, she requested each of them provide her with a list of three projects they thought should be a priority for the reference department. The responses were due by the end of the day on February 28.

---

[1] Unless otherwise stated, all relevant events occurred in 2006.

On March 5, Kaye sent Allen-Hart a lengthy response e-mail, which he copied to his coworkers. Rather than discuss project prioritization as Allen-Hart had requested, Kaye opted to discuss the "governance" of the reference department and his perception that the Library's management regards the full-time reference librarians as "fungible and disposable peons who are not genuinely valued." Among the reasons for his perception were recent schedule changes implemented by Allen-Hart. He considered the changes to be unwise and personally disadvantageous. Moreover, because he was not given an opportunity to discuss the changes beforehand, he regarded Allen-Hart's implementation of them as a "hypocritical," "hand-down-the-law approach" that "smacks of autocracy."

Another reason for his perception was what he characterized as his involuntary and arbitrary assignment to the Serra Cooperative Library System's ethnic diversity committee. In his view, the assignment did not suit his skills and interests and, therefore, "represents an administrative determination to deliberately squander law library funds and human resources on a relatively useless outside extravagance."

However, the chief reason for his perception was the inquiry into his invitation to speak at the AOC conference, which he regarded as humiliating and vindictive. He did not understand why Allen-Hart and Riger questioned the invitation since he was "possibly the only person in California who has any experience teaching appellate classes to pro per litigants" and had "unique experience and insights to contribute" to the conference. Although he acknowledged Allen-Hart and Riger were concerned about a breach of protocol, he suggested their concern "was really a pretext for some other hidden agenda." He speculated as to several possible ulterior motives, including that Allen-Hart and Riger were looking for a reason to discipline him or harass him into early retirement. Kaye did not explain why Allen-Hart and Riger might have such a motive; however, he accused them of "creating a hostile and insulting work environment for everyone" using methods "calculated to destroy any culture of professionalism in [the Library]." He further characterized the inquiry as a "vindictive, retaliatory, accusatory investigation[]" and their conduct as "disgusting, degrading, and utterly unprofessional."

Kaye also speculated that Allen-Hart and Riger may have wanted to usurp the invitation for themselves even though he was the only person on the Library's staff qualified to speak on the particular topic. In this regard, he opined the inquiry "smacks of petty, spiteful jealousy." He further warned "[i]t bodes badly for the future of our efforts [to create and conduct classes for self-represented litigants] if people are more concerned about who gets credit than about providing genuinely useful service to the public."

The last possibility Kaye suggested was that Riger feared Kaye's presence at the conference would interfere with Riger's plans to lobby court officials rather than actually attend the conference. Kaye questioned whether Riger was "equipped to network and lobby intelligently for our future" at a conference on self-represented litigants. Kaye also questioned whether Riger was eligible to attend the conference as it was for judicial officers and court employees. For this reason and because Riger planned to leave the conference early, Kaye also questioned whether Riger was eligible to have his expenses reimbursed by the AOC. Kaye opined that, if Riger attempted to submit an expense reimbursement application to the AOC, the application would be a false claim under California's False Claims Act (CFCA) (Gov. Code, § 12650 et seq.). He then suggested an investigation should be conducted to determine "who invited or acquiesced in designating [Riger] to travel to [the conference] at AOC expense as a representative of the San Diego Superior Court." He further suggested the inquiry into his own invitation was "just a self-righteous tactic to divert attention from that more serious misconduct." He went on to characterize the inquiry as "small-minded and inexcusable," and stated, because of it, "the library's managers have forfeited much of their credibility and goodwill in my eyes."

He concluded the e-mail by asserting his belief the reference librarians "work under an autocratic command structure and that reference staff meetings do not really serve much purpose." Therefore, he proclaimed, "Let the managers make their decisions without any pretense of collaboration and hand down their fiats from on high."

The day after Kaye sent the e-mail, Allen-Hart and Lawrence hand delivered a letter notifying him he was being placed on administrative leave pending an investigation of his e-mail. Approximately two weeks later, Allen-Hart sent him a letter notifying him she was proposing he be discharged for "insubordination and serious misconduct." The notice was subsequently rescinded and reissued under Riger's signature.

Cyndy Day-Wilson, an attorney and former member of the Library's board of trustees (Board), conducted a pretermination administrative hearing. After reviewing the evidence submitted by the parties, Day-Wilson concluded Kaye's "conduct constituted serious misconduct and justifies termination." Riger subsequently terminated Kaye effective August 3.

Kaye submitted a "Post-Termination Administrative Appeal" to the Board. A senior deputy with the San Diego County Counsel's Office then stepped in to assist the Library. The senior deputy wrote Kaye a letter explaining that Kaye's employment was at will by statute and, therefore, the only review available to Kaye was that provided in the Library's grievance procedure.

The senior deputy further explained to Kaye how to invoke the grievance procedure. The senior deputy's letter did not comment on the merits of Kaye's discharge. Kaye and the senior deputy exchanged further correspondence about the grievance procedure. The senior deputy also did not comment on the merits of Kaye's discharge in this correspondence.

Kaye submitted a grievance and argued his position before the Board at an open session on November 29. The senior deputy attended the open session, but did not comment on or respond to Kaye's arguments. However, Riger commented on and responded to some of Kaye's arguments.

After Kaye's arguments, the Board adjourned to closed session to deliberate. The senior deputy attended the closed session with the Board. Riger and the other Library managers who attended the open session did not attend the closed session. The Board did not conclude their deliberations that day.

The Board reconvened in closed session on December 4. The senior deputy attended this closed session as well. The Board voted to discharge Kaye and determined his discharge would be effective that day rather than August 3. The Board also determined Kaye should be paid his full salary through that day. Lawrence sent a letter the next day notifying Kaye of the Board's decision.

In a subsequent written decision, the Board clarified it was "exercising its own discretion and authority in this matter" and "not merely examining a prior managerial decision for ratification or nullification." The Board's decision further indicated the Board was not concerned about the substance of Kaye's complaints, but the manner in which he chose to raise them. In the Board's view, the e-mail appeared "intentionally calculated to disrupt the office, undermine the authority of the Director, and impinge upon working relationships within the Library." The Board further concluded "the email exhibited an inappropriate lack of judgment, professionalism and respect for the chain of command necessary for the effective functioning of the Law Library."

Kaye filed a combined complaint for wrongful termination and petition for writ of mandate (complaint) against the Board, the Library, Riger, and Allen-Hart.[2] The complaint contained six causes of action. The first and second causes of action have been removed to federal court. The third cause of action alleges his discharge violated Business and Professions Code section 6345. The fourth cause of action alleges the Board violated the Ralph M. Brown Act (Brown Act) (Gov. Code, § 54950 et seq.). The fifth cause of

---

[2] Kaye subsequently dismissed the complaint as to Allen-Hart.

action alleges his discharge violated the free speech clause in article I, section 2, subdivision (a) of the California Constitution. The sixth cause of action alleges his discharge violated the whistleblower protections in the CFCA.

The trial court granted summary adjudication as to each of these causes of action. Kaye appeals, raising numerous claims of error. We conclude Kaye cannot establish any of these causes of action and affirm the judgment.

## II

## STANDARD OF REVIEW

On appeal from an order granting summary adjudication we independently determine whether triable issues of material fact exist. In making this determination we view the evidence in a light favorable to the plaintiff. We liberally construe the plaintiff's evidentiary submission, strictly scrutinize the defendant's evidentiary submission, and resolve any evidentiary doubts or ambiguities in the plaintiff's favor. (*Saelzler v. Advanced Group 400* (2001) 25 Cal.4th 763, 768–769 [107 Cal.Rptr.2d 617, 23 P.3d 1143]; *Mills v. U.S. Bank* (2008) 166 Cal.App.4th 871, 895 [83 Cal.Rptr.3d 146]; *Stathoulis v. City of Montebello* (2008) 164 Cal.App.4th 559, 565 [78 Cal.Rptr.3d 910].)

## III

## DISCUSSION

A. *Kaye cannot establish his discharge violated the state Constitution's free speech clause*

In his fifth cause of action, Kaye contends his e-mail to Allen-Hart was protected speech and, therefore, his discharge violated the state Constitution's free speech clause. The United States Supreme Court recently addressed an analogous contention under the First Amendment. (*Garcetti v. Ceballos* (2006) 547 U.S. 410, 421 [164 L.Ed.2d 689, 126 S.Ct. 1951] (*Garcetti*).) In *Garcetti*, a deputy district attorney claimed his employer retaliated against him for writing a memo questioning the veracity of an affidavit used to support a search warrant and recommending dismissal of the related criminal case. (*Id.* at pp. 414–415.) Among its defenses, his employer claimed the memo was not protected speech under the First Amendment because the attorney wrote it as part of his employment duties. (547 U.S. at p. 415.) The United States Supreme Court agreed. (*Id.* at pp. 421–422.)

Relying on its prior decisions in *Connick v. Myers* (1983) 461 U.S. 138 [75 L.Ed.2d 708, 103 S.Ct. 1684] and *Pickering v. Board of Education* (1968)

391 U.S. 563 [20 L.Ed.2d 811, 88 S.Ct. 1731], the court explained the dilemma in public employee free speech cases is balancing the interests of a public employee as a citizen to comment on matters of public concern against the interests of a public employer " 'in promoting the efficiency of the public services it performs through its employees.' [Citation.]" (*Garcetti, supra,* 547 U.S. at p. 417.) Accordingly, two inquiries "guide interpretation of the constitutional protections accorded to public employee speech. The first requires determining whether the employee spoke as a citizen on a matter of public concern. [Citation.] If the answer is no, the employee has no First Amendment cause of action based on his or her employer's reaction to the speech." (*Id.* at p. 418.) If the answer is yes, then "[t]he question becomes whether the relevant government entity had an adequate justification for treating the employee differently from any other member of the general public." (*Ibid.*)

■ Applying this analytical framework, the Supreme Court noted the deputy district attorney wrote the memo as part of his regular job duties and "spoke as a prosecutor fulfilling a responsibility to advise his supervisor about how best to proceed with a pending case." (*Garcetti, supra,* 547 U.S. at p. 421.) The court reasoned, "[r]estricting speech that owes its existence to a public employee's professional responsibilities does not infringe any liberties the employee might have enjoyed as a private citizen. It simply reflects the exercise of employer control over what the employer itself has commissioned or created." (*Id.* at pp. 421–422.) Consequently, the court held "when public employees make statements pursuant to their official duties, the employees are not speaking as citizens for First Amendment purposes, and the Constitution does not insulate their communications from employer discipline." (*Id.* at p. 421.)

Kaye concedes his cause of action fails if *Garcetti* applies to it; however, he contends *Garcetti* does not apply to violations of the state Constitution's free speech clause. We conclude there is no merit to this contention.

■ Under the state Constitution, "[e]very person may freely speak, write and publish his or her sentiments on all subjects, being responsible for the abuse of this right." (Cal. Const., art. I, § 2, subd (a).) "The California free speech clause is broader and more protective than the First Amendment free speech clause. [Citation.] However, the fact that our provision is worded more expansively and has been interpreted as being more protective than the First Amendment in some respects does not mean that it is broader in all its applications. [Citation.] Generally, when we interpret a provision of the California Constitution that is similar to a provision of the federal Constitution, we will not depart from the United States Supreme Court's construction of the similar federal provision unless we are given cogent

reasons to do so." (*Edelstein v. City and County of San Francisco* (2002) 29 Cal.4th 164, 168, 179 [126 Cal.Rptr.2d 727, 56 P.3d 1029].)

Among the reasons potentially supporting a departure from Supreme Court precedent on free speech questions are: "(1) something 'in the language or history of the California provision suggests that the issue before us should be resolved differently than under the federal Constitution' [citation]; (2) 'the high court "hands down a decision which limits rights established by earlier precedent in a manner inconsistent with the spirit of the earlier opinion" ' [citation]; (3) there are vigorous 'dissenting opinions [or] incisive academic criticism of those decisions' [citation]; or (4) following the federal rule would 'overturn established California doctrine affording greater rights' [citation]." (*Gallo Cattle Co. v. Kawamura* (2008) 159 Cal.App.4th 948, 959 [72 Cal.Rptr.3d 1].) None of these reasons supports a departure from the holding in *Garcetti*.

Kaye does not identify anything in the language or history of the state Constitution's free speech clause suggesting *Garcetti* should not apply. In addition, *Garcetti* does not, as Kaye suggests, limit rights established by earlier precedents in a manner inconsistent with those precedents. Rather, *Garcetti* relied upon and applied earlier precedents to address an issue that had never been directly addressed by them—whether the First Amendment protects a public employee's speech made during the ordinary course of the public employee's duties.

Although there were dissenting opinions in *Garcetti* and there has been academic commentary on the decision, dissenting opinions and academic commentary are common occurrences when the Supreme Court decides cases involving important constitutional rights. Consequently, the existence of dissenting opinions and academic commentary is not a sufficient basis by itself for departing from the Supreme Court's construction, particularly where, as here, the Supreme Court's rationale is not illogical, unpersuasive, or incompatible with its prior precedents. (*Gallo Cattle Co. v. Kawamura, supra*, 159 Cal.App.4th at pp. 961–964; *People v. Teresinski* (1982) 30 Cal.3d 822, 836–837 [180 Cal.Rptr. 617, 640 P.2d 753]; *Committee to Defend Reproductive Rights v. Myers* (1981) 29 Cal.3d 252, 267, fn. 17 [172 Cal.Rptr. 866, 625 P.2d 779].)

█ Finally, following *Garcetti* would not overturn established California doctrine affording greater rights. California courts have routinely followed Supreme Court precedents in addressing public employee free speech matters. (See, e.g., *Department of Corrections v. State Personnel Bd.* (1997) 59 Cal.App.4th 131, 138–149 [69 Cal.Rptr.2d 34]; *Kirchmann v. Lake Elsinore Unified School Dist.* (1997) 57 Cal.App.4th 595, 601–614 [67 Cal.Rptr.2d

268]; *Campbell v. State Personnel Bd.* (1997) 57 Cal.App.4th 281, 287–290 [66 Cal.Rptr.2d 722]; *Gray v. County of Tulare* (1995) 32 Cal.App.4th 1079, 1089–1096 [38 Cal.Rptr.2d 317]; *Chico Police Officers' Assn. v. City of Chico* (1991) 232 Cal.App.3d 635, 642–652 [283 Cal.Rptr. 610]; *Franklin v. Leland Stanford Junior University* (1985) 172 Cal.App.3d 322, 336–343 [218 Cal.Rptr. 228].) We have not located any California authorities affording public employees greater protection in this area. Although one appellate court was specifically invited to find greater protection under the California Constitution, it declined the invitation observing, "federal law has been leading the way for California cases involving discipline of employees for free speech activities, and we see no reason to depart from its essential reasonableness." (*Franklin v. Leland Stanford Junior University, supra,* 172 Cal.App.3d at p. 342, fn. 8.) For the reasons stated, we agree with this observation and, applying *Garcetti,* we conclude Kaye cannot establish his discharge violated the state Constitution's free speech clause.

B.  *Kaye cannot establish his discharge violated the CFCA's whistleblower protections*

█ In his sixth cause of action, Kaye contends his discharge violated the CFCA because his discharge was based in part on his suggestion that Riger may not have wanted him to attend the conference to prevent him from discovering Riger might be intending to submit a false claim for reimbursement of conference-related expenses.[3] Under the CFCA, an employer may not "discharge . . . an employee . . . because of lawful acts done by the employee . . . in disclosing information to a government or law enforcement agency or in furthering a false claims action, including investigation for, initiation of, testimony for, or assistance in, an action filed or to be filed under Section 12652 [to enforce the CFCA]." (Gov. Code, § 12653, subd. (b).) This code section, characterized as the whistleblower protection provision of the CFCA, is construed broadly. (*Southern Cal. Rapid Transit Dist. v. Superior Court* (1994) 30 Cal.App.4th 713, 724 [36 Cal.Rptr.2d 665]; *LeVine v. Weis* (2001) 90 Cal.App.4th 201, 210 [108 Cal.Rptr.2d 562] (*LeVine*), disapproved on another ground in *Wells v. One2One Learning Foundation* (2006) 39 Cal.4th 1164, 1196–1197 [48 Cal.Rptr.3d 108, 141 P.3d 225].)

There is a dearth of California authority discussing what constitutes protected activity under the CFCA. However, because the CFCA is patterned

---

[3] In his reply brief, Kaye invites us to consider sua sponte the issue of whether public entities can even be sued for retaliatory discharge under the CFCA. In connection with this invitation, he requests judicial notice of excerpts from the CFCA's legislative history. As this issue was not raised by the parties below or in their opening briefs and as we need not resolve the issue to decide Kaye's appeal, we decline the invitation and deny the request for judicial notice.

on a similar federal statute (31 U.S.C. § 3729 et seq.), we may rely on cases interpreting the federal statute for guidance in interpreting the CFCA. (*City of Pomona v. Superior Court* (2001) 89 Cal.App.4th 793, 801–802 [107 Cal.Rptr.2d 710].)

Generally, to constitute protected activity under the CFCA, the employee's conduct must be in furtherance of a false claims action. (*U.S. ex rel. Hopper v. Anton* (9th Cir. 1996) 91 F.3d 1261, 1269.) The employee does not have to file a false claims action or show a false claim was actually made; however, the employee must have reasonably based suspicions of a false claim and it must be reasonably possible for the employee's conduct to lead to a false claims action. (*LeVine, supra,* 90 Cal.App.4th at p. 210; *Mendiondo v. Centinela Hosp. Med. Center* (9th Cir. 2008) 521 F.3d 1097, 1103; *U.S. ex rel. Hopper v. Anton, supra,* 91 F.3d 1261, 1269.) "Saber-rattling is not protected conduct." (*Luckey v. Baxter Healthcare Corp.* (7th Cir. 1999) 183 F.3d 730, 733.)

In this case, it is readily apparent from their context that the remarks in Kaye's e-mail about Riger's conference attendance were not in furtherance of a false claims action. The undisguised purpose of the e-mail was to complain about the inquiry into Kaye's speaking invitation not to report or initiate an investigation into a false claim. A disgruntled employee's expression of dissatisfaction with his treatment on the job is not protected activity under the CFCA. (*U.S. ex rel. Yesudian v. Howard University* (D.C. Cir. 1998) 332 U.S. App.D.C. 56 [153 F.3d 731, 740].)

Moreover, Kaye's remarks did not reflect reasonably based suspicions of an imminent false claim. Instead, his remarks were insinuations based on speculation and inaccurate assumptions about the approval and funding for Riger's conference attendance. It is not reasonably possible for such remarks to lead to a false claims action. As Kaye's conduct was not protected under the CFCA, we conclude Kaye cannot establish his discharge violated the CFCA.

C. *Kaye cannot establish his discharge violated Business and Professions Code section 6345*

In his third cause of action, Kaye contends Riger's decision to discharge him violates Business and Professions Code section 6345. This code section authorizes the Board to "appoint a librarian and define the powers and prescribe the duties of any officers, determine the number, and elect all necessary subordinate officers and assistants, and *at its pleasure remove any officer or assistant.*" (Italics added.) Since this code section does not expressly authorize the Board to delegate its removal power, Kaye

contends Riger had no power to discharge him. We need not decide this issue because, even assuming Kaye's contention is correct, the Board independently determined to discharge Kaye at its December 4 meeting.[4] Accordingly, Kaye cannot establish his discharge violated this code section.

## D.  *Kaye cannot establish the Board violated the Brown Act*

In his fourth cause of action, Kaye contends the Board violated the Brown Act at its November 29 and December 4 meetings by (1) deliberating on his grievance in closed session, and (2) using the same attorney who advocated on behalf of the Library to advise the Board in closed session. On appeal, Kaye continues to contend the Board violated the Brown Act on November 29 and December 4 by its choice of advisory counsel. However, Kaye no longer contends the Board violated the Brown Act by deliberating in closed session on these dates. Instead, he contends the Board violated the Brown Act at its meeting on March 22 by viewing a copy of Kaye's e-mail in closed session and at its meeting on June 26 by receiving a supplemental report about Kaye's conduct in closed session.

As Kaye acknowledged at oral argument below, his contentions regarding the Board's March 22 and June 26 meetings are not included in his fourth cause of action. Accordingly, we do not consider these contentions in determining whether the trial court properly granted summary adjudication of this cause of action. (*Government Employees Ins. Co. v. Superior Court* (2000) 79 Cal.App.4th 95, 98–99, fn. 4 [93 Cal.Rptr.2d 820]; *Laabs v. City of Victorville* (2008) 163 Cal.App.4th 1242, 1253, 1258 [78 Cal.Rptr.3d 372].)

Since Kaye is no longer arguing the Board's closed session deliberations on November 29 and December 4 violated the Brown Act, we turn to his remaining contention that the Board's choice of advisory counsel did so. The code section Kaye relies upon in his fourth cause of action to support the violation is Government Code section 54957, subdivision (b). This code section permits the Board to meet in closed session "to consider the appointment, employment, evaluation of performance, discipline, or dismissal of a public employee or to hear complaints or charges brought against the employee by another person or employee unless the employee requests a public session." (Gov. Code, § 54957, subd. (b)(1).)

In addition, this code section provides that, before the Board can meet in closed session on specific complaints or charges brought against an employee, the Board must give the employee at least 24 hours' written notice of

---

[4] The Board made Kaye's discharge effective as of this date and authorized backpay for him through this date. Although Kaye apparently has not received the backpay because of unrelated retirement system issues, this does not negate the independence of the Board's determination.

the employee's right to have the complaints or charges heard by the Board in open session rather than in closed session. (Gov. Code, § 54957, subd. (b)(2).) This code section also authorizes the Board to exclude witnesses from the meeting under certain circumstances and clarifies that an "employee" includes certain independent contractors. (Gov. Code, § 54957, subd. (b)(3), (4).)

Nothing in this code section limits whom the Board may choose to advise it when it conducts meetings involving employment matters and Kaye has not cited to any other provision of the Brown Act to support his claim. Therefore, we conclude Kaye cannot establish the Board's choice of advisory counsel violated the Brown Act.

Kaye's reliance on our decision in *Howitt v. Superior Court* (1992) 3 Cal.App.4th 1575 [5 Cal.Rptr.2d 196] (*Howitt*) is misplaced. *Howitt* did not involve a Brown Act claim and, consequently, provides no guidance on whether the Board's choice of advisory counsel violated the Brown Act. Rather, in *Howitt*, we observed that there are due process concerns when an attorney from one office acts as an advocate for a party and another attorney from the same office acts as an advisor to the decision maker in the same matter. (*Howitt*, at pp. 1585–1586.) The due process concerns we identified in *Howitt* are not at issue in this case because Kaye's employment was at will and because his state law causes of action do not include a due process claim.

Even if we were to consider the Board's choice of advisory counsel under due process principles, we would conclude Kaye could not state a claim because there is no evidence the senior deputy county counsel who advised the Board ever acted as an advocate adverse to Kaye. The senior deputy's involvement in the matter occurred when the matter came before the Board as a grievance, after Allen-Hart, Riger, and Day-Wilson determined Kaye should be discharged. The senior deputy's communications with Kaye addressed procedural issues, not the merits of Kaye's position. Furthermore, the senior deputy did not represent the Library's position during the grievance hearing, Riger did. As all of counsel's actions vis-à-vis Kaye were consistent with those of a legal adviser to the Board rather than an advocate for the Library or its management, Kaye's due process rights were not violated by the Board's choice of advisory counsel. (*Witt Home Ranch, Inc. v. County of Sonoma* (2008) 165 Cal.App.4th 543, 568–569 [81 Cal.Rptr.3d 123].)

## IV

## DISPOSITION

The judgment is affirmed. Respondents are awarded their appeal costs.

Huffman, J., and McDonald, J., concurred.

A petition for a rehearing was denied December 2, 2009, and appellant's petition for review by the Supreme Court was denied February 24, 2010, S178930. Baxter, J., did not participate therein.