******************************************************

The "officially released" date that appears near the beginning of each opinion is the date the opinion will be published in the Connecticut Law Journal or the date it was released as a slip opinion. The operative date for the beginning of all time periods for filing postopinion motions and petitions for certification is the "officially released" date appearing in the opinion. In no event will any such motions be accepted before the "officially released" date.

All opinions are subject to modification and technical correction prior to official publication in the Connecticut Reports and Connecticut Appellate Reports. In the event of discrepancies between the electronic version of an opinion and the print version appearing in the Connecticut Law Journal and subsequently in the Connecticut Reports or Connecticut Appellate Reports, the latest print version is to be considered authoritative.

The syllabus and procedural history accompanying the opinion as it appears on the Commission on Official Legal Publications Electronic Bulletin Board Service and in the Connecticut Law Journal and bound volumes of official reports are copyrighted by the Secretary of the State, State of Connecticut, and may not be reproduced and distributed without the express written permission of the Commission on Official Legal Publications, Judicial Branch, State of Connecticut.

******************************************************

RICHARD TRUSZ *v.* UBS REALTY
INVESTORS, LLC, ET AL.
(SC 19323)

Palmer, Zarella, Eveleigh, McDonald, Espinosa, Robinson and
Vertefeuille, Js.

*Argued March 24—officially released October 13, 2015*

*Procedural History*

Action to recover damages for the allegedly wrongful termination of the plaintiff's employment, and for other relief, brought to the United States District Court for the District of Connecticut, where the defendants filed a motion for summary judgment; thereafter, the court, *Squatrito, J.*, certified to this court a question of law regarding the interpretation of General Statutes § 31-51q.

*Wesley W. Horton*, with whom were *Todd Steigman*, *Karen L. Dowd* and, on the brief, *Jacques J. Parenteau*, for the appellant (plaintiff).

*James A. Wade*, with whom were *Brett J. Boskiewicz* and, on the brief, *Thomas J. Donlon*, for the appellees (defendants).

*Sandra J. Staub*, *David J. McGuire* and *Martin B. Margulies* filed a brief for the American Civil Liberties Union of Connecticut as amicus curiae.

*Charles Krich*, principal attorney, and *Jane Kelleher*, law student intern, filed a brief for the Commission on Human Rights and Opportunities as amicus curiae.

*Daniel A. Schwartz*, *Christopher T. Parkin* and *Clarisse N. Thomas* filed a brief for Connecticut Business and Industry Association, Inc., as amicus curiae.

*Opinion*

PALMER. J. This case comes before us on certification from the United States District Court for the District of Connecticut pursuant to General Statutes § 51-199b. The certified question that we must answer is: "Does the rule announced by the [United States] Supreme Court in *Garcetti* v. *Ceballos*, 547 U.S. 410, [421, 126 S. Ct. 1951, 164 L. Ed. 2d 689] (2006), i.e., 'that when . . . employees make statements pursuant to their official duties, the employees are not speaking as citizens for [f]irst [a]mendment purposes, and the [c]onstitution does not insulate their communications from employer discipline,' apply to a claim that an employer violated [General Statutes] § 31-51q[1] by subjecting an employee 'to discipline or discharge on account of the exercise by such employee of rights guaranteed by . . . [§§] 3, 4 or 14 of article first of the [c]onstitution of the state . . . .?" (Footnote added.) We conclude that the answer to this question is "no." We further conclude that a modified form of the *Pickering/ Connick* balancing test applies to speech by a public employee pursuant to the employee's official duties under the state constitution; see *Connick* v. *Myers*, 461 U.S. 138, 142, 103 S. Ct. 1684, 75 L. Ed. 2d 708 (1983) (in determining scope of public employee's constitutional right to free speech in workplace, court's task is to seek "a balance between the interests of the [employee], as a citizen, in commenting upon matters of public concern and the interest of the [s]tate, as an employer, in promoting the efficiency of the public services it performs through its employees" [internal quotation marks omitted]); *Pickering* v. *Board of Education*, 391 U.S. 563, 568, 88 S. Ct. 1731, 20 L. Ed. 2d 811 (1968) (same); and that § 31-51q extends the same protection to similar speech by a private employee. Specifically, we conclude that, under the state constitution, employee speech pursuant to official job duties on certain matters of significant public interest is protected from employer discipline in a public workplace, and § 31-51q extends the same protection to employee speech pursuant to official job duties in the private workplace.

The District Court's certification order sets forth the following facts that we accept as true for purposes of responding to the certified question. "[The defendant UBS Realty Investors, LLC (UBS Realty)] provides real estate investment management services to clients, such as pension funds, public employee retirement systems, foundations, and private investors. UBS Realty is registered with the Securities and Exchange Commission as an investment advisor. UBS Realty is a subsidiary of [the defendant] UBS AG[2] and is part of UBS AG's [g]lobal [a]sset [m]anagement division. UBS AG is a corporation whose stock is publicly traded on the New York Stock Exchange.

"At all times pertinent to this action, the plaintiff,

Richard Trusz, was the head of UBS Realty's valuation unit and a [m]anaging [d]irector of UBS Realty. As head of the valuation unit, [the plaintiff] managed the process which ultimately resulted in the valuation of properties held in UBS Realty's private real estate investment funds. In early 2008 [the plaintiff] reported to UBS Realty management what he contended were errors in the valuation of certain properties held by UBS Realty in various investment funds. At that time [the plaintiff] also expressed to UBS Realty management his opinions that UBS Realty was obligated to correct and disclose to investors the valuation errors, that UBS Realty was obligated to return to investors any excess management fees received as a result of the valuation errors, that the valuation unit had insufficient staff and resources to adequately perform its function, that UBS Realty's internal controls regarding valuation were inadequate, that UBS Realty improperly provided preferential treatment to certain investors, and that UBS Realty was breaching fiduciary duties it owed to its investors.

"UBS Realty's compliance officer subsequently investigated [the plaintiff's] contentions. Although the report issued at the conclusion of this investigation confirmed the valuation errors reported by [the plaintiff], it concluded that none of the errors rose to a level that required UBS Realty to restate the values to its investors or return any management fees that had been paid by investors. A third-party auditor for some of the funds managed by UBS Realty also investigated [the plaintiff's] claims of valuation errors. The auditor confirmed valuation errors, but concluded that these errors were not material to the funds' financial statements and did not require a restatement of any of the financial statements for the funds.

"[The plaintiff] disagreed with the conclusions of the compliance officer and the third-party auditor and continued to express to both UBS Realty and UBS AG his opinion that by not disclosing property valuation errors to investors and not adjusting management fees in light of these valuation errors, UBS Realty was violating its fiduciary, legal, and ethical obligations to its investors.

"[The plaintiff] subsequently filed discrimination and retaliation complaints with the Connecticut Commission on Human Rights and Opportunities, the United States Equal Employment Opportunity Commission, and the United States Occupational Safety and Health Administration. [The plaintiff] claimed that UBS Realty discriminated against him based on a disability—a heart condition—and later retaliated against him by taking adverse employment actions, culminating in his termination in August, 2008, because he opposed what he believed was unlawful activity by the defendants and because he had reported alleged securities laws violations. The defendants dispute [the plaintiff's] allegations of unlawful activity. [The plaintiff] sued [the

defendants] in federal court in 2009." (Footnote added.) The plaintiff alleged, among other things, that the defendants had violated § 31-51q by subjecting him to discipline "on account of the exercise . . . of rights guaranteed by . . . [§§] 3, 4 or 14 of article first of the [c]onstitution of Connecticut."

Thereafter, the defendants filed a motion for summary judgment contending that they were entitled to judgment as a matter of law on the plaintiff's claim under § 31-51q.[3] Before the court, Squatrito, J.,[4] could rule on that motion, this court issued its decision in *Schumann* v. *Dianon Systems, Inc.*, 304 Conn. 585, 598, 43 A.3d 111 (2012), in which we concluded that the United States Supreme Court's decision in *Garcetti*, holding that speech pursuant to a public employee's official job duties was not protected by the first amendment; *Garcetti* v. *Ceballos*, supra, 547 U.S. 421 (public employees who make statements pursuant to their official duties are not speaking as citizens for purposes of first amendment); applies to claims brought pursuant to § 31-51q against a private employer that are based on the first amendment. See *Schumann* v. *Dianon Systems, Inc.*, supra, 598. In light of our decision in *Schumann*, the plaintiff filed in the District Court a motion for conference to discuss new authority in which he stated that he intended to argue that *Garcetti* did not apply to his retaliation claim because he was raising that claim under the state constitution.[5] The District Court asked the parties to submit briefs on the question of whether it should certify the issue raised by the plaintiff to this court. The defendants filed a brief contending that § 31-51q did not apply because the plaintiff's workplace speech did not relate to matters of public concern and, therefore, was not constitutionally protected under either *Garcetti* or the *Pickering/Connick* balancing test.[6] The defendants also argued, however, that if the District Court were to determine that the plaintiff's speech did involve matters of public concern, it should certify the issue to this court. The plaintiff contended in his brief that the requirements for certification set forth in § 51-199b had been met and the question of whether the *Garcetti* standard applies to the free speech provisions of the state constitution should be certified to this court, provided that doing so would not delay proceedings in the District Court. Thereafter, the District Court issued its order of certification to this court, and we accepted the question of law previously set forth in this opinion.[7]

To provide context for our resolution of the certified question, we briefly review the governing legal principles. "In *Pickering* v. *Board of Education*, [supra, 391 U.S. 568] . . . the court . . . recognized that a government has interests as an employer in regulating the speech of its employees that differ significantly from those it possesses in connection with regulation of the speech of the citizenry in general. The court then set

forth a general principle governing the constitutionality of government restrictions on the speech of its employees: in evaluating the constitutionality of government restrictions on an employee's speech, a court must arrive at a balance between the interests of the [employee], as a citizen, in commenting upon matters of public concern and the interest of the [s]tate, as an employer, in promoting the efficiency of the public services it performs . . . ." (Internal quotation marks omitted.) *Schumann* v. *Dianon Systems, Inc.*, supra, 304 Conn. 601. "In *Connick* v. *Myers*, supra, 461 U.S. 150, the court added a modification to the general balancing test promulgated in *Pickering*. Under *Connick*, if a government employee's speech cannot be fairly characterized as constituting speech on a matter of public concern, it is unnecessary . . . to scrutinize the reasons for [his or] her discharge." (Internal quotation marks omitted.) *Schumann* v. *Dianon Systems, Inc.*, supra, 601. Thus, under the *Pickering/Connick* balancing test, employee speech in a public workplace is protected from employer discipline if it involves a matter of public concern and if the employee's interest in commenting on the matter outweighs the employer's interest in promoting the efficient performance of public services.

In *Garcetti* v. *Ceballos*, supra, 547 U.S. 418–19, a majority of the United States Supreme Court noted "the practical difficulties of applying the principles articulated in *Pickering* and *Connick* . . . [and] then observed that '[g]overment employers, like private employers, need a significant degree of control over their employees' words and actions; without it, there would be little chance for the efficient provision of public services. . . . Public employees, moreover, often occupy trusted positions in society. When they speak out, they can express views that contravene governmental policies or impair the proper performance of governmental functions.' " (Citation omitted.) *Schumann* v. *Dianon Systems, Inc.*, supra, 304 Conn. 602. "The court emphasized that [u]nderlying [its] cases has been the premise that while the [f]irst [a]mendment invests public employees with certain rights, it does not empower them to constitutionalize the employee grievance. [*Garcetti* v. *Ceballos*, supra] 420, quoting *Connick* v. *Myers*, supra, 461 U.S. 154. Thus, the court concluded that, when public employees make statements pursuant to their official duties, the employees are not speaking as citizens for [f]irst [a]mendment purposes, and the [c]onstitution does not insulate their communications from employer discipline. *Garcetti* v. *Ceballos*, supra, 421 . . . ."[8] (Citation omitted; footnotes omitted; internal quotation marks omitted.) *Schuman* v. *Dianon Systems, Inc.*, supra, 603. The court in *Garcetti* reasoned that "[r]estricting speech that owes its existence to a public employee's professional responsibilities does not infringe any liberties the

employee might have enjoyed as a private citizen. It simply reflects the exercise of employer control over what the employer itself has commissioned or created." *Garcetti* v. *Ceballos*, supra, 421–22. Accordingly, under *Garcetti*, a court will subject the employee's speech to the *Pickering/Connick* balancing test only if it first determines that the employee was not speaking pursuant to his or her official duties; if the employee was speaking as an employee rather than as a citizen, the speech is not protected by the first amendment.

In *Cotto* v. *United Technologies Corp.*, 251 Conn. 1, 8, 738 A.2d 623 (1999), a majority of this court concluded that § 31-51q prohibits a private employer from disciplining an employee for engaging in constitutionally protected speech not only when the speech occurs outside the workplace, but also when it occurs in the workplace.[9] Thereafter, in *Schumann* v. *Dianon Systems, Inc.*, supra, 304 Conn. 610–11, we addressed a claim by an employee against his private employer pursuant to § 31-51q alleging that the employer had unlawfully disciplined him for exercising his first amendment rights in the workplace. The plaintiff in *Schumann* claimed that "*Garcetti*, which involved a public employer-employee relationship, should not be applied to the private workplace" so as to limit the scope of employee speech that is protected by § 31-51q. Id., 598. The defendant contended that, to the contrary, § 31-51q applied only to speech by a private employee that would be protected from employer discipline in a public workplace under *Garcetti*. Id., 597–98. This court agreed with the defendant.[10] Id., 598. We did not reach the plaintiff's claim in *Schumann* that the state constitution provided broader protection than *Garcetti* because the plaintiff had failed to raise the issue in the trial court and, even if the issue had been properly before us, the plaintiff's speech would not have been protected under the broader *Pickering/Connick* balancing test that the plaintiff advocated. Id., 619. The state constitutional issue that we were not required to decide in *Schumann* is now squarely before us.

Before considering the merits of the certified question, however, we must first address a threshold issue. The defendants claim that this court in *Cotto* v. *United Technologies Corp.*, supra, 251 Conn. 1, "left open" the question of whether *any* speech in the private workplace is constitutionally protected, and they contend that it is not. The defendants further contend that, because § 31-51q applies only to constitutionally protected speech, no § 31-51q claim arising from speech in the workplace is possible. Contrary to the defendants' claim, however, *Cotto* clearly held that at least some employee speech in the workplace is constitutionally protected. See id., 8 ("§ 31-51q confirms the legislature's intent to provide coverage for the exercise of *constitutional* rights at a private as well as at a public workplace" [emphasis added]). Otherwise, § 31-51q would

not protect it. See General Statutes § 31-51q (employer may not subject employee to discipline "on account of the exercise by such employee of rights guaranteed by the first amendment . . . or [§§] 3, 4 or 14 of article first of the [c]onstitution of the state"). Indeed, there was no suggestion to the contrary, either by the defendant in *Cotto* or by Justice Borden in his concurring and dissenting opinion in that case. Specifically, Justice Borden did not argue that employee speech in a private workplace was not constitutionally protected, that is, that it could be prohibited or punished by the government at will, but only that interference with such speech by a private employer did not violate the employee's constitutional rights. *Cotto* v. *United Technologies Corp.*, supra, 26; but see footnote 9 of this opinion.

Moreover, nothing in *Pickering*, *Connick* or *Garcetti* supports the proposition that speech in the workplace, whether public or private, generally enjoys less first amendment protection than speech elsewhere. Rather, the United States Supreme Court emphasized in *Connick* that even speech by an employee on personal and private matters enjoys first amendment protection in the workplace, in the sense that such speech cannot be lawfully prohibited or punished by the government. See *Connick* v. *Myers*, supra, 461 U.S. 147 ("We in no sense suggest that speech on private matters falls into one of the narrow and well-defined classes of expression which carries so little social value, such as obscenity, that the [s]tate can prohibit and punish such expression by all persons in its jurisdiction. . . . For example, an employee's false criticism of his employer on grounds not of public concern may be cause for his discharge but would be entitled to the same protection in a libel action accorded an identical statement made by a man on the street." [Citations omitted.]). The court also emphasized that it was holding "only that when a public employee speaks not as a citizen upon matters of public concern, but instead as an employee upon matters only of personal interest, absent the most unusual circumstances, a federal court is not the appropriate forum in which to review the wisdom of a personnel decision taken by a public agency allegedly in reaction to the employee's behavior." Id. In other words, although workplace speech on private matters is protected by the first amendment to the same extent that it is protected elsewhere insofar that it cannot be punished or prohibited by the government acting in its role as a *lawmaker*, a public employer nevertheless may discipline the employee for such speech in its role as an *employer*, subject to certain limitations.

We do not suggest that, because *all* speech in the workplace is constitutionally protected to the same extent as speech elsewhere, the protection provided to the speech of public employees by the United States Supreme Court's decisions in *Pickering*, *Connick* and *Garcetti* was based on something other than first

amendment principles. To the contrary, the court has drawn the line between constitutionally protected speech that is also protected from discipline by a public employer and constitutionally protected speech that may subject the employee to employer discipline by analyzing "the hierarchy of [f]irst [a]mendment values . . . ." (Internal quotation marks omitted.) Id., 145. The court concluded in *Connick* that, because certain speech is low in the hierarchy of constitutionally protected speech, the first amendment does not protect it *from discipline by a public employer*. Id., 145–47. Only in that special and narrow sense, however, may it be said that such speech is not constitutionally protected.[11] Although we recognize that this distinction may seem somewhat technical, making the distinction is important in order to avoid the type of confusion into which the defendants in the present case appear to have fallen, and also to avoid any suggestion that the government, acting as a lawmaker, has greater leeway to regulate speech in the workplace than it has to regulate speech in other locales. Because it is undisputed that § 31-51q was intended to prevent interference by a private employer with the constitutionally protected speech of its employees, and because employee speech in a private workplace is constitutionally protected to the same extent that it is protected in other locales, in the sense that the government cannot prohibit or punish it, we reject the defendants' claim that "no § 31-51q claim is possible" based on employee speech in a private workplace.[12]

We note, however, that this court held in *Schumann* v. *Dianon Systems, Inc.*, supra, 304 Conn. 607–608, that § 31-51q was not intended to confer on employees in the private sector a *broader* right to be free from employer discipline on the basis of speech in the workplace than the constitutionally based right enjoyed by employees in the public sector, and the plaintiff in the present case has not asked us to reconsider that decision. See id., 607 ("[w]e disagree with those cases holding *Garcetti* inapplicable in the private sector because of their incongruous effect of giving private sector employees greater workplace free speech rights than those afforded to their public sector counterparts"). In other words, we concluded in *Schumann* that any limitations on the first amendment right of employees in a public workplace to be free from discipline on the basis of their speech also apply to the speech rights of employees in a private workplace under § 31-51q. We can perceive no reason, and the plaintiff does not contend, that the same principle should not apply to speech rights under the state constitution. The *defendants* contend, however, that the scope of the right of an employee in a private workplace to be free from employer discipline based on speech pursuant to § 31-51q is *narrower* than the analogous constitutionally based right of a public employee in some respects. Accordingly, the questions that we

must answer are: (1) What is the scope of the protection afforded by the free speech provisions of the state constitution to a public employee's speech in the workplace?; and (2) Is the protection afforded by § 31-51q to an employee's speech in a private workplace coextensive with or narrower than the protection afforded by the speech provisions of the state constitution to speech by an employee in a public workplace?[13]

## I

We first address the scope of a public employee's right to be protected from employer discipline on the basis of workplace speech under the speech provisions of the state constitution. The plaintiff contends that the free speech provisions of the state constitution provide broader protection to the speech of public employees than does the first amendment. Specifically, the plaintiff contends that the flexible *Pickering/Connick* formula, and not the bright line rule of *Garcetti*, applies to workplace speech by a public employee under the state constitution. We conclude that the state constitution incorporates a slightly modified form of the *Pickering/Connick* test.

"It is [well established] that federal constitutional and statutory law establishes a minimum national standard for the exercise of individual rights and does not inhibit state governments from affording higher level of protection for such rights. . . . *State* v. *Geisler*, 222 Conn. 672, 684, 610 A.2d 1225 (1992). In determining the contours of the protections provided by our state constitution, we employ a multifactor approach that we first adopted in *Geisler*. The factors that we consider are: (1) the text of the relevant constitutional provisions; (2) related Connecticut precedents; (3) persuasive federal precedents; (4) persuasive precedents of other state courts; (5) historical insights into the intent of [the] constitutional [framers]; and (6) contemporary understandings of applicable economic and sociological norms." (Internal quotation marks omitted.) *State* v. *Kelly*, 313 Conn. 1, 14, 95 A.3d 1081 (2014). We now turn to these factors.

## A

We first address the text of the operative constitutional provision. Article first, § 4, of the Connecticut constitution provides: "Every citizen may freely speak, write and publish his sentiments on all subjects, being responsible for the abuse of that liberty." Article first, § 5, of the Connecticut constitution provides: "No law shall ever be passed to curtail or restrain the liberty of speech or of the press." Finally, article first, § 14, of the Connecticut constitution provides: "The citizens have a right, in a peaceable manner, to assemble for their common good, and to apply to those invested with the powers of government, for redress of grievances, or other proper purposes, by petition, address or remon-

strance."

This court previously has held that because, unlike the first amendment to the federal constitution: (1) article first, § 4, of the Connecticut constitution includes language protecting free speech "on all subjects"; (2) article first, § 5, of the Connecticut constitution uses the word "ever," thereby providing "additional emphasis to the force of the provision"; (internal quotation marks omitted) *State* v. *Linares*, 232 Conn. 345, 381, 655 A.2d 737 (1995); and (3) article first, § 14, of the Connecticut constitution provides a right to seek redress for grievances by way of "remonstrance," and therefore "sets forth free speech rights more emphatically than its federal counterpart"; (internal quotation marks omitted) *State* v. *Linares*, supra, 381; these textual differences "warrant an interpretation separate and distinct from that of the first amendment." (Internal quotation marks omitted.) Id. The text of article first, § 4, of the Connecticut constitution providing that citizens of this state are free to speak "on *all* subjects, being responsible for the abuse of that liberty"; (emphasis added); is particularly relevant in the present case. This broad and encompassing language supports the conclusion that the state constitution protects employee speech in the public workplace on the widest possible range of topics, as long as the speech does not undermine the employer's legitimate interest in maintaining discipline, harmony and efficiency in the workplace. See *Ozols* v. *Madison*, United States District Court, Docket No. 3:11cv1324 (SRU) (D. Conn. August 20, 2012) ("[t]he breadth of the Connecticut [c]onstitution's language suggests that a citizen's speech is protected, even when the speech is about her employment"). This standard is more consistent with the *Pickering/Connick* standard than with *Garcetti*. Compare *Pickering* v. *Board of Education*, supra, 391 U.S. 568 (employee has right to comment on matters of public interest that must be weighed against employer's interest in promoting efficient services); id., 570 (noting employer's interest in maintaining discipline, harmony, personal loyalty and confidence in workplace), with *Garcetti* v. *Ceballos*, supra, 547 U.S. 423–24 (employee's speech pursuant to his or her official job duties is not constitutionally protected, even if it involves matter of public concern and employee's interest in commenting on matter outweighs employer's interest in performing its services efficiently). It is apparent, therefore, that the text of article first, § 4, supports the plaintiff's position that the *Pickering/Connick* balancing test provides the proper standard under the state constitution.

In support of their claim to the contrary, the defendants contend that, because article first, § 4, of the Connecticut constitution provides that "[e]very citizen," and not every *person*, "may freely speak, write and publish his sentiments on all subjects," the provision is narrower than the first amendment. They further

contend that, when a person is speaking pursuant to his or her official job duties, the person is not speaking as a citizen and, therefore, the speech is not protected under this provision. Cf. *Garcetti* v. *Ceballos*, supra, 547 U.S. 421 ("when public employees make statements pursuant to their official duties, the employees are not speaking as citizens for [f]irst [a]mendment purposes"); *Connick* v. *Myers*, supra, 461 U.S. 146 ("[w]hen employee expression cannot be fairly considered as relating to any matter of political, social, or other concern to the community, government officials should enjoy wide latitude in managing their offices, without intrusive oversight by the judiciary in the name of the [f]irst [a]mendment"). The defendants' argument, however, proves too much. Taken to its logical conclusion, the defendants' interpretation would permit the state to regulate *all* speech on personal or private matters that is not made in the speaker's capacity as a citizen, regardless of where the speech occurred. There is no evidence that the constitutional framers intended to impose such severe limits on the speech rights of the state's citizenry. Moreover, the defendants' interpretation would render article first, § 4, internally inconsistent, as it would prevent citizens from speaking freely "on *all* subjects"; (emphasis added) Conn. Const., art. 1, § 4; including those subjects that do not involve the speaker's role as a citizen. For these reasons, we reject the defendants' contention.

## B

We next consider the second *Geisler* factor, the holdings and dicta of this court and the Appellate Court. As we have indicated, this court held in *State* v. *Linares*, supra, 232 Conn. 381, that the free speech provisions of the state constitution have "an interpretation separate and distinct from that of the first amendment"; (internal quotation marks omitted); and that "the framers of our constitution contemplated vibrant public speech, and a minimum of governmental interference . . . ." Id., 386. In *Linares*, this court rejected the rigid "federal forum analysis, which affords the most rigorous protection of speech only at 'traditional' forums and narrowly defines 'traditional' to exclude modern public gathering places often otherwise compatible with public expression" in favor of a more "flexible approach," requiring a "case-by-case balancing of the right to free speech against the competing interest of preventing unreasonable interference with the 'normal activity' of a particular place." Id., 382. This court reasoned that "this flexible approach prohibits the government from unilaterally and unnecessarily limiting speech . . . ." Id., 386. Similarly, in the present case, the sensitive, case-by-case balancing test set forth in *Pickering* and *Connick* would minimize unilateral governmental interference with employee speech that is compatible with the legitimate interests of employers more effectively than the rigid *Garcetti* rule, which cate-

gorically denies constitutional protection to any speech by an employee in his or her official capacity, regardless of whether the speech unduly burdens the employer.

Moreover, as the Appellate Court has observed, "Connecticut's appellate courts have not been hesitant to continue to grant its citizens the same protection as did the 'old' federal decisions, when the United States Supreme Court has retreated from a previously enunciated broad protection reading of [a federal constitutional provision]."[14] *State* v. *DeFusco*, 27 Conn. App. 248, 256, 606 A.2d 1 (1992), aff'd, 224 Conn. 627, 620 A.2d 746 (1993). This willingness to adhere to an old rule that provides broader protection than the new rule is consistent with the principle that "our state constitution is an instrument of progress, it is intended to stand for a great length of time and should not be interpreted too narrowly or too literally so that it fails to have contemporary effectiveness for all of our citizens." (Internal quotation marks omitted.) *State* v. *Linares*, supra, 232 Conn. 382. When a constitutional rule has been in place for a long period of time, a sudden contraction of the rule may well violate the entrenched constitutional expectations of the state's citizenry.[15] Cf. *State* v. *DeFusco*, supra, 256 (observing that, in *State* v. *Marsala*, 216 Conn. 150, 579 A.2d 58 [1990], this "court interpreted our state constitution to allow the maintenance of a constitutional status quo that had existed for our citizens for at least twenty-nine years"). We note that *Pickering* was decided in 1968, *Connick* was decided in 1983 and *Garcetti* was decided in 2006. Thus, the citizens of this state enjoyed the benefit of the *Pickering* balancing test for thirty-eight years. Accordingly, we conclude that the precedents of this court and the Appellate Court support the plaintiff's position in the present case.[16]

C

We next address the third *Geisler* factor, persuasive federal precedent. As we have explained, the primary federal precedents consist of the United States Supreme Court's decisions in *Pickering*, *Connick* and *Garcetti*. For the following interrelated reasons, we find *Pickering* and *Connick* to be more persuasive than *Garcetti*.

First, we believe that the distinction that the court made in *Garcetti* between an employee's speech on a matter of public concern in the speaker's role as citizen and an employee's speech on a matter of public concern pursuant to official duties is somewhat artificial and potentially difficult to apply. See *Ozols* v. *Madison*, supra, United States District Court, Docket No. 3:11cv1324 (SRU) (concluding that *Garcetti* does not apply to § 31-51q claims under state constitution because "there is something strangely arbitrary about a judicial inquiry into when a citizen is acting as a citizen"). As Justice Souter pointed out in his dissenting opinion in *Garcetti*, under the rule adopted by the majority in that case, a "schoolteacher is protected

when complaining to the principal about hiring policy," because hiring is not within the duties of a teacher, but "a school personnel officer would not be [protected] if he protested that the principal disapproved of hiring minority job applicants." *Garcetti* v. *Ceballos*, supra, 547 U.S. 430; see also id., 429 (Souter, J., dissenting), citing *Madison, Joint School District No. 8* v. *Wisconsin Employment Relations Commission*, 429 U.S. 167, 177 n.11, 97 S. Ct. 421, 50 L. Ed. 2d 376 (1976) (schoolteacher who spoke at school board meeting about pending labor negotiations between board and teachers' union spoke "both as an employee and a citizen exercising [f]irst [a]mendment rights"); *Garcetti* v. *Ceballos*, supra, 427 (Stevens, J., dissenting) ("[P]ublic employees are still citizens while they are in the office. The notion that there is a categorical difference between speaking as a citizen and speaking in the course of one's employment is quite wrong."). Justice Souter also stated in his dissenting opinion that this distinction "seems stranger still in light of the majority's concession of some [f]irst [a]mendment protection when a public employee repeats statements made pursuant to his duties but in a separate, public forum or in a letter to a newspaper." *Garcetti* v. *Ceballos*, supra, 430 n.1. He argued that "separating the citizen's interest from the employee's interest ignores the fact that the ranks of public service include those who share the poet's 'object . . . to unite [m]y avocation and my vocation'; these citizen servants are the ones whose civic interest rises highest when they speak pursuant to their duties, and these are exactly the ones government employers most want to attract." (Footnote omitted.) Id., 432 (Souter, J., dissenting). Finally, Justice Souter observed in his dissent that "public employees are often the members of the community who are likely to have informed opinions as to the operations of their public employers, operations which are of substantial concern to the public. Were they not able to speak on these matters, the community would be deprived of informed opinions on important public issues. . . . This is not a whit less true when an employee's job duties require him to speak about such things: when, for example, a public auditor speaks on his discovery of embezzlement of public funds, when a building inspector makes an obligatory report of an attempt to bribe him, or when a law enforcement officer expressly balks at a superior's order to violate constitutional rights he is sworn to protect." (Citation omitted; internal quotation marks omitted.) Id., 433. We generally find Justice Souter's argument persuasive.

Second, and relatedly, although *Garcetti* sought to justify the adoption of a categorical rule on the ground that a more flexible test "would commit state and federal courts to a new, permanent, and intrusive role, mandating judicial oversight of communications between and among government employees and their superiors in the course of official business"; id., 423;

*Garcetti* has merely created new uncertainties that will require judicial resolution. Specifically, the court in *Garcetti* did not provide any clear guidance on what speech will be found to be "pursuant to official responsibilities," but merely noted that "[t]he proper inquiry is a practical one." Id., 424; see also C. Rhodes, "Public Employee Speech Rights Fall Prey to an Emerging Doctrinal Formalism," 15 Wm. & Mary Bill Rts. J. 1173, 1193 (2007) ("the [c]ourt [in *Garcetti*] has merely shifted the uncertainty to the scope of the underlying categorization"); C. Rhodes, supra, 1194–98 (discussing conundrums that arise when attempting to apply " 'practical inquiry' " standard under *Garcetti*). Not surprisingly, courts have struggled with this issue. See *Weintraub* v. *Board of Education*, 593 F.3d 196, 203 (2d Cir.) (concluding that teacher who filed grievance to complain about supervisor's failure to discipline student who repeatedly threw books at teacher was speaking pursuant to official duties "even though [such speech] is not required by, or included in, the employee's job description or in response to a request by the employer" because speech "was part-and-parcel of his concerns about his ability to properly execute his duties" [internal quotation marks omitted]), cert. denied, 562 U.S. 995, 131 S. Ct. 444, 178 L. Ed. 2d 344 (2010); id., 205 (Calabresi, J., dissenting) (arguing that *Garcetti* "lends itself to multiple interpretations, and the majority's decision to construe it broadly . . . while a possible reading, is not compelled by anything in the Supreme Court's opinion"); *Davis* v. *McKinney*, supra, 518 F.3d 314 (under *Garcetti*, court is required to analyze "separately each aspect of a communication with multiple topics and recipients" to determine whether each aspect of speech was pursuant to official job duties); *Davis* v. *McKinney*, supra, 315 (employee speech "directed within the employee's chain of command is not protected," but speech to fellow employee outside chain of command is protected). Accordingly, we are not persuaded that *Garcetti*'s purported bright line rule reduces the need for judicial oversight of workplace disputes.

Third, we are persuaded that "*Garcetti*'s reasoning . . . turned the *Pickering/Connick* test on its head by privileging employment status over the subject matter of public employee speech." S. Nahmod, "Public Employee Speech, Categorical Balancing and § 1983: A Critique of *Garcetti* v. *Ceballos*," 42 U. Rich. L. Rev. 561, 573 (2008). As we have explained, in *Pickering* and *Connick*, the court focused on the place of the employee's speech in the "the hierarchy of [f]irst [a]mendment values . . . ." (Internal quotation marks omitted.) *Connick* v. *Myers*, supra, 461 U.S. 145. If the speech occupied a high rung in that hierarchy, it was protected. In contrast, *Garcetti* focuses on "the employee's [f]irst [a]mendment status. If the speech is required by the job, the public employee loses his status as a

citizen with [f]irst [a]mendment protection against employer discipline . . . ." S. Nahmod, supra, 574. This is so even if the speech has the highest first amendment value because it involves a matter of great public concern, and even if the speech imposed little burden on the employer's legitimate interests. See, e.g., *Davis* v. *McKinney*, supra, 518 F.3d 315–16 (employee's speech to supervisor expressing concerns about inadequate response to employee's investigation into fellow employees' use of workplace computers to access pornography, possibly including child pornography, not protected from employer discipline under *Garcetti*); *Morales* v. *Jones*, 494 F.3d 590, 593–94, 597 (7th Cir. 2007) (police officer's statement to fellow police officer that deputy police chief had harbored felon not protected because first police officer had official duty to apprise second police officer of information pertinent to investigation; second police officer's statement to district attorney about deputy chief's harboring felon not protected because second police officer had duty to assist district attorney by providing details of investigation), cert. denied, 522 U.S. 1099, 128 S. Ct. 905, 169 L. Ed. 2d 729 (2008); see also *Morales* v. *Jones*, supra, 598 (concluding that first police officer's deposition testimony regarding deputy chief was protected and recognizing "the oddity of a constitutional ruling in which speech said to one individual may be protected under the [f]irst [a]mendment, while precisely the same speech said to another individual is not protected"); compare *Lane* v. *Franks*,     U.S.    , 134 S. Ct. 2369, 2378 n.4, 2380, 189 L. Ed. 2d 312 (2014) (holding that truthful sworn testimony in court given outside job duties is protected, but declining to address question whether truthful sworn testimony pursuant to employee's ordinary job duties would be protected). We conclude that the flexible *Pickering/Connick* balancing test is preferable to *Garcetti*'s categorical rule in this context. See C. Rhodes, supra, 15 Wm. & Mary Bill Rts. J. 1192 ("[p]ublic employee speech cases defy simple rule-based categorization because of the almost limitless circumstances in which they arise").

Fourth, because employee speech to persons outside the workplace is potentially protected under *Garcetti* even if it involves the employee's official duties, *Garcetti* creates a perverse incentive for public employees to bring their work-related concerns to such persons before trying to resolve them internally.[17] See *Garcetti* v. *Ceballos*, supra, 547 U.S. 423–24 ("Employees who make public statements outside the course of performing their official duties retain some possibility of [f]irst [a]mendment protection because that is the kind of activity engaged in by citizens who do not work for the government. The same goes for writing a letter to a local newspaper . . . ." [Citations omitted.]); see also *Davis* v. *McKinney*, supra, 518 F.3d 315–16 (employee's speech to supervisor complaining of inadequate

response to employee's investigation revealing use of workplace computers to view pornography not protected, while employee's complaints to Federal Bureau of Investigation about possible use of computers to view child pornography were protected);[18] P. Secunda, "*Garcetti*'s Impact on the First Amendment Speech Rights of Federal Employees," 7 First Amend. L. Rev. 117, 127 (2008–2009) ("[t]he moral of the *Garcetti* story appears to be to go directly to an external agency, do not pass [g]o, and certainly do not attempt to resolve internally").

Finally, although we recognize that public employers have an important interest in ensuring that "their employees' official communications are accurate, demonstrate sound judgment and promote the employer's mission"; (internal quotation marks omitted) *Garcetti* v. *Ceballos*, supra, 547 U.S. 434 (Souter, J., dissenting); we are persuaded by Justice Souter's argument that this interest can be adequately protected by applying a slightly modified *Pickering* test, under which the employee could prevail only if "he speaks on a matter of unusual importance and satisfies high standards of responsibility in the way he does it."[19] Id., 435. Specifically, Justice Souter proposed that "only comment on official dishonesty, deliberately unconstitutional action, other serious wrongdoing, or threats to health and safety can weigh out in an employee's favor" when an employee is speaking pursuant to official job duties. Id. Thus, under Justice Souter's proposed standard, speech pursuant to an employee's official duties regarding, for example, a mere policy disagreement with the employer would not be protected, even if it pertained to a matter of public concern and had little effect on a legitimate employer interest.[20]

Because we find *Pickering* and *Connick* to be more persuasive than *Garcetti*, we conclude that the weight of *persuasive* federal precedent favors a broader reading of the free speech provisions of the state constitution than of the first amendment.

D

We next address the fourth *Geisler* factor, persuasive sister state decisions. The defendants point out that the three state courts that have considered the issue that is before us have concluded that *Garcetti* applies to claims under the respective state constitution. See *Kaye* v. *Board of Trustees*, 179 Cal. App. 4th 48, 101 Cal. Rptr. 3d 456 (2009); *Newell* v. *Runnels*, 407 Md. 578, 967 A.2d 729 (2009); *Gilbert* v. *Flandreau Santee Sioux Tribe*, 725 N.W.2d 249 (S.D. 2006).

We do not find these cases persuasive. In *Kaye* v. *Board of Trustees*, supra, 179 Cal. App. 4th 57–58, the court concluded the relevant state constitutional provision[21] was not broader than the first amendment in this context because *Garcetti* did not narrow the scope of

protected speech in the workplace and the case was not "illogical, unpersuasive or incompatible with its prior precedents." For the reasons set forth in part I C of this opinion, we disagree with this conclusion. In *Newell* v. *Runnels*, supra, 407 Md. 608, the court merely stated conclusorily that the speech protections provided by the Maryland constitution[22] are "generally 'coextensive' with the protections accorded by the [f]irst [a]mendment." There is no such general presumption in this state. Similarly, the court in *Gilbert* v. *Flandreau Santee Sioux Tribe*, supra, 725 N.W.2d 258, stated that the majority of states with constitutional free speech provisions like South Dakota's[23] "have interpreted their state constitutional free speech provisions as coextensive with their federal counterparts." The court did not analyze *Garcetti* or compare the holding and reasoning of that case to the holdings and reasoning of the United States Supreme Court in *Pickering* and *Connick*. These cases, therefore, provide little, if any, support to the defendants' position in the present case.

E

We next consider the fifth *Geisler* factor, historical insights into the intent of the constitutional framers. This court previously has recognized that "our constitution's speech provisions reflect a unique historical experience and a move toward enhanced civil liberties, particularly those liberties designed to foster individuality. . . . This historical background indicates that the framers of our constitution contemplated vibrant public speech, and a minimum of governmental interference . . . ." (Citation omitted; internal quotation marks omitted.) *State* v. *Linares*, supra, 232 Conn. 385–86. Thus, this factor supports the conclusion that, when employee speech will not unduly interfere with a public employer's interests in promoting efficient services, in maintaining discipline, harmony, personal loyalty and confidence in the workplace and in setting official policy within the limits of the law, the mere fact that the employee was speaking pursuant to his or her official duties should not subject the employee to discipline.

F

Finally, we consider the sixth *Geisler* factors, contemporary understandings of applicable economic and sociological norms. This factor has significant overlap with the first *Geisler* factor, the persuasiveness of the United States Supreme Court's decision in *Pickering*, *Connick* and *Garcetti*. Specifically, we noted in part I A of this opinion that, by eliminating first amendment protection for employee speech pursuant to official job duties, even if the speech is on a matter of public concern and places little burden on the employer, *Garcetti* reduced the likelihood that public employees would speak to their employers regarding corrupt practices, threats to the public safety or other illegal or dangerous workplace practices. Thus, the persons who are in the

best position to know about corrupt or dangerous practices by public entities face the prospect of discipline or discharge if they bring such practices to the attention of their employers. Moreover, *Garcetti* created an incentive for public employees to raise their concerns outside the workplace in the first instance. Although public employees certainly have the *right* to raise their concerns externally, we can discern no public policy that would be advanced by *requiring* them to do so. Finally, the public policy expressed by § 31-51q is that employees in this state should have the right to speak freely on all subjects, even in the workplace, as long as their speech does not "substantially or materially interfere with the employee's bona fide job performance or the working relationship between the employee and the employer . . . ." General Statutes § 31-51q. Accordingly, we conclude that these public policy factors weigh in favor of the plaintiff's position.

The defendants contend, however, that other public policy considerations weigh strongly in favor of applying the *Garcetti* standard to claims under the state constitution. First, they contend that public employers have the right to control their employees' official job related speech so that their communications are accurate and promote the employer's mission. Under the standard that Justice Souter articulated in his dissenting opinion in *Garcetti*, however; see part I C of this opinion; inaccurate employee speech or employee speech that undermines a *legitimate* employer policy or mission would not be protected. Although employee speech that undermines a corrupt or dangerous employer mission would be protected, we have concluded that this fact weighs against adopting the *Garcetti* standard as the state constitutional standard.

Second, relying on our decision in *Schumann*, the defendants contend that applying *Garcetti* would avoid a clash of employee and employer speech rights. See *Schumann* v. *Dianon Systems, Inc.*, supra, 304 Conn. 610 ("[a]pplying *Garcetti* to federal constitutional claims brought under § 31-51q keeps courts from the constitutionally untenable task of, in essence, having to choose sides in a work-related viewpoint dispute between two private actors"); see also *Cotto* v. *United Technologies Corp.*, supra, 251 Conn. 30 (*Borden, J.*, concurring and dissenting) ("interpreting [§ 31-51q] to apply to private workplace conduct could . . . bring two competing sets of expressive rights into conflict, and therefore places the state, in the form of the courts, on one side of that contest"). The question that we were addressing in *Schumann*, however, is whether *Garcetti* limited the scope of employee speech in the *private* workplace that was protected by § 31-51q or, instead, as the plaintiff in that case claimed, § 31-51q applied to *all* such speech that is protected by the first amendment in the sense that the government cannot punish or prohibit it. *Schumann* v. *Dianon Systems, Inc.*, supra, 598.

The question that we are addressing here is whether *Garcetti* or the *Pickering/Connick* test provides the proper rule for public employees under the state constitution. Nothing in *Garcetti*, *Pickering* or *Connick* suggests that a public employer has any speech rights beyond the right to control its official policies within the limits of the law and to efficiently and properly carry out its legitimate mission. Accordingly, if the *Pickering/Connick* test is adequate to protect that right, the fact that it may limit other speech of the public employer has no bearing on our analysis. The question of whether *Garcetti* is preferable to the *Pickering/Connick* test in the *private* workplace is more properly considered in part II of this opinion, in which we address the defendants' claim that § 31-51q protects less speech in a private workplace than the state constitution protects in a public workplace.

Third, the defendants contend that extending constitutional protection to job related speech would transform § 31-51q into "a sweeping whistleblower protection law that will apply to all public and private employers in any circumstance," and that doing so is more properly the function of the legislature than of this court. Again, we disagree. If the *Garcetti* standard is inconsistent with the intent of the constitutional framers to protect speech by public employees on *all* subjects to the greatest extent possible, consistent with the legitimate interests of public employers, we cannot adopt that standard merely because the constitutional speech provisions confer greater protection in certain circumstances than that provided by statute. The legislature has no power to define constitutional speech rights. See *Garcetti* v. *Ceballos*, supra, 547 U.S. 430 (Souter, J., dissenting) ("[t]he applicability of a provision of the [c]onstitution has never depended on the vagaries of state or federal law" [internal quotation marks omitted]); id., 440 ("the combined variants of statutory whistle-blower definitions and protections add up to a patchwork, not a showing that [constitutional] worries may be remitted to legislatures for relief"). Accordingly, the question of whether § 31-51q protects less speech in the private workplace than is constitutionally protected in the public workplace is also more properly considered in part II of this opinion.

Finally, the defendants contend that the bright line rule of *Garcetti* provides clearer guidance to employers than the flexible *Pickering/Connick* test. As we explained in part I C of this opinion, however, *Garcetti* merely substituted one difficult question—whether a public employee is speaking pursuant to his official job duties or as a citizen—for another difficult question— whether the employee's speech is on a matter of public concern and outweighs the employer's legitimate interests in workplace discipline, order and efficiency. But even if it is true that the rule in *Garcetti* is marginally easier to apply than the *Pickering/Connick* test, that

fact would hardly outweigh the obvious benefits associated with the significantly greater free speech rights afforded under the latter standard.

## G

In summary, the *Geisler* factors as a whole provide considerable support for the plaintiff's claim that the *Garcetti* standard does not comport with the free speech provisions of the state constitution, and no such factor provides any meaningful support for a contrary determination. We conclude, therefore, that Justice Souter's modified *Pickering/Connick* balancing test, which recognizes both the state constitutional principle that speech on *all* subjects should be protected to the maximum extent possible and the important interests of an employer in controlling its own message and preserving workplace discipline, harmony and efficiency, provides the proper test for determining the scope of a public employee's rights under the free speech provisions of the state constitution when the employee is speaking pursuant to his or her official duties. Id., 435 (Souter, J., dissenting) ("only comment on official dishonesty, deliberately unconstitutional action, other serious wrongdoing, or threats to health and safety can weigh out in an employee's favor" when employee is speaking pursuant to official duties); see also part I C of this opinion. In our view, Justice Souter's test properly balances the employer's heightened interest in controlling employee speech pursuant to official job duties—an interest that *Pickering* did not specifically address—and the important interests of the employee and of the public in allowing employees to speak without fear of retaliation about matters of particularly acute public concern—interests that the *Garcetti* standard fails to protect. As Justice Stevens aptly stated in his dissenting opinion in *Garcetti*, "[t]he proper answer to the question 'whether the [constitution] protects a government employee from discipline based on speech made pursuant to the employee's official duties' . . . is '[s]ometimes,' not '[n]ever.'" *Garcetti* v. *Ceballos*, supra, 547 U.S. 426 (Stevens, J., dissenting).

## II

We next consider the defendants' claim that the scope of speech that is protected by § 31-51q is narrower than the scope of speech by public employees that is protected by the free speech provisions of the state constitution. Specifically, the defendants contend that: (1) private employers have the right to control their employees' job related speech; (2) applying the *Garcetti* standard under § 31-51q avoids a clash of employee and employer speech rights; (3) broadening the scope of whistleblower speech that is protected by § 31-51q is a matter for the legislature, not this court; (4) applying the *Pickering/Connick* test under § 31-51q undermines the ability of private employers to make timely and certain decisions; and (5) the public policy in favor of

bringing corrupt and dangerous employer practices to light carries less weight when the employer is private. We address, and reject, each of these claims in turn.

With respect to the defendants' first claim, that private employers have the right to control their employees' job related speech, we are satisfied that the modified *Pickering/Connick* standard adequately protects this right. Under this standard, if an employee's job related speech reflects a mere policy difference with the employer, it is not protected. It is only when the employee's speech is on a matter of public concern and implicates an employer's "official dishonesty . . . other serious wrongdoing, or threats to health and safety"; id., 435 (Souter, J., dissenting); that the speech trumps the employer's right to control its own employees and policies.[24] With respect to the defendants' argument that "[t]he general public does not have the same interest in, or entitlement to, information about the operations of private businesses" as it has in public entities, the defendants fail to recognize that, even under *Garcetti*, an employee's speech *outside* the workplace *about* the employee's job related duties—for example, a letter to the editor—is protected, as long as the speech involves a matter of public concern. See *Garcetti* v. *Ceballos*, supra, 547 U.S. 423. Accordingly, we fail to see how protecting such speech *within* the workplace would threaten a private employer's privacy interests. To the contrary, protecting such speech will remove the incentive for an employee to raise concerns publicly without first raising them internally. Finally, we are mindful that "[a]s a remedial statute, § 31-51q deserves a generous construction . . . ." *Cotto* v. *United Technologies Corp.*, supra, 251 Conn. 8–9.

The defendants also claim that the *Garcetti* standard avoids a clash of employee and employer speech rights. We are persuaded that the modified *Pickering/Connick* standard is sufficient to avoid such a clash. We first note that when Justice Borden, in his concurring and dissenting opinion in *Cotto*; see id., 30; and Justice Zarella, in his concurring opinion in *Schumann*; see *Schumann* v. *Dianon Systems, Inc.*, supra, 304 Conn. 636; expressed concerns about a clash of employee and employer speech rights, they were objecting to the holding of the court in *Cotto* that § 31-51q applies to employee speech in the private workplace. The correctness of that holding is not before us in this appeal. Rather, the issue that we are deciding is whether *Garcetti* or the *Pickering/Connick* balancing test, or some other standard, determines the scope of the protection afforded by § 31-51q to employee speech in the private workplace. For all of the reasons that we have previously discussed in this opinion, we conclude that the modified *Pickering/Connick* test does not place a significantly greater burden on the speech rights of private employers than does the *Garcetti* test.[25] The only employee speech that is protected by the modified *Pick-*

*ering/Connick* test and that is *not* protected by *Garcetti* is speech pursuant to an employee's official job duties that is on a matter of public concern and involves the employer's "official dishonesty . . . other serious wrongdoing, or threats to health and safety . . . ." *Garcetti* v. *Ceballos*, supra, 547 U.S. 435 (Souter, J., dissenting). Moreover, the defendants in the present case have made no claim that their own first amendment rights would be violated if § 31-51q protected the plaintiff's speech.[26] Accordingly, we reject this claim.

The defendants next argue that the decision to extend whistleblower protection to employee speech pursuant to official job duties in a private workplace should be left to the legislature. The legislature, however, has expressed its intent in § 31-51q that constitutionally protected speech in the private workplace should be protected from employer discipline. See *Cotto* v. *United Technologies Corp.*, supra, 251 Conn. 16 ("[W]e are persuaded that the legislature meant what it said. Section 31-51q extends protection of rights of free speech under the federal and the state constitutions to employees in the private workplace."). We have concluded in the present case that, under the free speech provisions of the state constitution, speech by a public employee on *all* subjects, including internal whistleblowing speech, should be protected from employer discipline to the greatest extent possible, consistent with the legitimate interests of the employer. We see no evidence that the legislature intended to carve out an exception for internal whistleblowing speech under § 31-51q merely because such speech is not protected under other statutory provisions.[27] To the contrary, as we observed in *Cotto*, the legislative history of § 31-51q supports the conclusion that one purpose of the statute was to protect employees from retribution for speaking about dangerous or illegal workplace conditions. See id., 9–10 (underscoring remarks of Senator Howard T. Owens during Senate debate on proposed legislation that purpose of legislation was to prevent retribution against employees who complain about violations of federal occupational safety laws and labor laws). We therefore reject this claim as well.

The defendants further contend that § 31-51q should not protect employee speech pursuant to official job duties because employers need to be able to make timely decisions with certainty. They argue that the bright line rule of *Garcetti* provides clearer guidance than the flexible *Pickering/Connick* test as to when employee speech is protected from discipline. We note, however, that, although there is no presumption that the official job duties of a private employee, unlike those of a public employee, implicate the public interest, under the state constitutional standard that we have adopted in the present case employee speech pursuant to official job duties would be protected by § 31-51q only to the extent that it involves dishonest or dangerous

practices by the employer that would be a matter of public concern. When speaking on such matters, a private employee is speaking both as an employee and as a citizen, just as a public employee would be. Accordingly, for the same reason that we rejected this claim in part I B of this opinion, namely, that the question of whether an employee is speaking as a citizen or as an employee is often no less difficult than the questions presented by the *Pickering/Connick* test, we also reject it here.

Similarly, with respect to the defendants' claim that greater efficiency and proper performance by a private employer are not matters of public concern, although we would agree that that is true as a general rule, it is clear that that is not always the case. Under the standard that we have adopted, only employee speech that involves employer policies and practices that *are* matters of significant public concern is protected. For that reason, this claim also fails.

### III

For all of the foregoing reasons, we conclude that the answer to the certified question is "no." We further conclude that the *Pickering/Connick* balancing test, as modified by Justice Souter in his dissenting opinion in *Garcetti*; see *Garcetti* v. *Ceballos*, supra, 547 U.S. 435 (Souter, J., dissenting) ("only comment on official dishonesty, deliberately unconstitutional action, other serious wrongdoing, or threats to health and safety can weigh out in an employee's favor" when employee is speaking pursuant to official duties); applies to speech in a public workplace under the state constitution and that § 31-51q extends the same protection to employee speech in a private workplace for claims involving the state constitution.

No costs will be taxed in this court to the plaintiff or the defendants.

In this opinion EVELEIGH, McDONALD, ESPINOSA, ROBINSON and VERTEFEUILLE, Js., concurred.

[1] General Statutes § 31-51q provides: "Any employer, including the state and any instrumentality or political subdivision thereof, who subjects any employee to discipline or discharge on account of the exercise by such employee of rights guaranteed by the first amendment to the United States Constitution or section 3, 4 or 14 of article first of the Constitution of the state, provided such activity does not substantially or materially interfere with the employee's bona fide job performance or the working relationship between the employee and the employer, shall be liable to such employee for damages caused by such discipline or discharge, including punitive damages, and for reasonable attorney's fees as part of the costs of any such action for damages. If the court determines that such action for damages was brought without substantial justification, the court may award costs and reasonable attorney's fees to the employer."

[2] Hereinafter, joint references to UBS Realty and UBS AG are to the defendants, and references to the defendants individually are by name.

[3] Because the record before us does not contain the defendants' motion for summary judgment, the basis of the defendants' claim is unclear.

[4] Hereinafter, all references to the District Court are to Judge Squatrito unless otherwise indicated.

[5] Before filing their motion for summary judgment, the defendants had

filed a motion to dismiss the plaintiff's claims. In her ruling on the motion to dismiss the claim pursuant to § 31-51q, the District Court judge to whom the matter was then assigned, Arterton, J., concluded that *Garcetti* did not apply to the claim because *Garcetti* did not apply to claims arising in a private workplace. See *Trusz* v. *UBS Realty Investors*, *LLC*, United States District Court, Docket No. 3:09cv268 (JBA) (D. Conn. March 30, 2010). This court's decision in *Schumann* abrogated Judge Arterton's ruling.

[6] See *Garcetti* v. *Ceballos*, supra, 547 U.S. 419 ("[s]o long as employees are speaking as citizens about matters of public concern, they must face only those speech restrictions that are necessary for their employers to operate efficiently and effectively"); *Connick* v. *Myers*, supra, 461 U.S. 146 ("[w]hen employee expression cannot be fairly considered as relating to any matter of political, social, or other concern to the community, government officials should enjoy wide latitude in managing their offices, without intrusive oversight by the judiciary in the name of the [f]irst [a]mendment").

[7] After we accepted the certified question from the District Court, we granted permission to the American Civil Liberties Union of Connecticut and the Commission on Human Rights and Opportunities to file briefs as amici curiae in support of the plaintiff's position, and to the Connecticut Business and Industry Association, Inc., to file an amicus curiae brief in support of the defendants' position.

[8] In *Garcetti*, Justice Stevens authored a dissenting opinion; see *Garcetti* v. *Ceballos*, supra, 547 U.S. 426; Justice Souter authored a dissenting opinion, in which Justice Stevens and Justice Ginsburg joined; id., 427; and Justice Breyer authored a dissenting opinion. Id., 444. We discuss the substance of these dissenting opinions later in this opinion.

[9] Justice Borden authored a concurring and dissenting opinion in *Cotto*, in which he argued that, although § 31-51q applied to private employers, it did not provide protection against infringement of speech rights in a private workplace, because interference with speech rights by a private employer does not violate the constitution. *Cotto* v. *United Technologies Corp.*, supra, 251 Conn. 32–33. Justice Katz authored a concurring and dissenting opinion in which she agreed with the majority's interpretation of § 31-51q, but disagreed with the majority's conclusion that the defendant had not violated the statute. Id., 41. Justice Francis McDonald issued a concurring opinion in which he maintained that § 31-51q did not apply to employee speech in the workplace because private employers have a constitutional right to express their own views on their property, free from government interference. Id., 53–54.

[10] We note that Justice Zarella authored a concurring opinion in which he argued that § 31-51q was inapplicable to any speech made by an employee in a private workplace and that *Cotto* should be overruled. *Schumann* v. *Dianon Systems, Inc.*, supra, 304 Conn. 628–29.

[11] To be sure, some language in *Schumann* may be read as suggesting that private employee speech pursuant to official job duties is not protected under the first amendment. See *Schumann* v. *Dianon Systems, Inc.*, supra, 304 Conn. 610 n.21 (rejecting plaintiff's claim that § 31-51q applies to employee speech pursuant to official duties because "§ 31-51q, by its plain language, applies only 'to constitutionally protected speech,' " which, under *Garcetti*, does not include speech pursuant to official job duties). To the extent that this language possibly could be interpreted to suggest that the government may freely punish or prohibit such speech, we now disavow any such suggestion. Rather, as we have explained, speech by a public employee pursuant to official job duties is not constitutionally protected under the federal constitution only in the special sense that the constitution does not insulate such speech from employer discipline.

[12] We recognize that § 31-51q confers only *statutory* protection against a private employer's interference with constitutionally protected employee speech, whereas an employer's right to address employees as it sees fit is, at least to some degree, *constitutionally* protected from government interference. To the extent that the defendants intended to claim that § 31-51q is facially unconstitutional because it confers a statutory speech right on employees that constrains the employer's constitutional speech rights, we conclude that any such claim is unreviewable because it was inadequately briefed.

[13] The District Court has asked us only to articulate the proper legal standard under the state constitution; it has not asked us to apply that standard to the facts of this case.

[14] "See, e.g., *State* v. *Marsala*, [216 Conn. 150, 579 A.2d 58 (1990)]; *State* v. *Geisler*, supra, [222 Conn. 672]. Thus, in [*Marsala*], our Supreme Court refused to follow *United States* v. *Leon*, 468 U.S. 897, 104 S. Ct. 3405, 82 L.

Ed. 2d 677 (1984), and gave our citizens the protection of the exclusionary rule, under our constitution, undiluted by a good faith exception, as allowed in *Leon*. Until *Leon*, a broad exclusionary rule under the federal constitution had been a constant in fourth amendment analysis, having been first announced in *Weeks* v. *United States*, 232 U.S. 383, [398] 34 S. Ct. 341, 58 L. Ed. 652 (1914), and made applicable to the states through the fourteenth amendment to the United States constitution in *Mapp* v. *Ohio*, 367 U.S. 643, [655] 81 S. Ct. 1684, 6 L. Ed. 2d 1081 (1961). The *Marsala* court interpreted our state constitution to allow the maintenance of a constitutional status quo that had existed for our citizens for at least twenty-nine years.

"In [*Geisler*], this court refused to follow *New York* v. *Harris*, 495 U.S. 14, 110 S. Ct. 1640, 109 L. Ed. 2d 13 (1990). The *Harris* court also created an exception to the exclusionary rule under the federal constitution, and held that evidence obtained outside a residence, immediately following an illegal warrantless arrest made in the residence, was admissible at trial. [Id., 21.] Such evidence had been previously banned as violative of the fourth amendment. See *Payton* v. *New York*, 445 U.S. 573, [590] 100 S. Ct. 1371, 63 L. Ed. 2d 639 (1980). Our conclusion in *Geisler* aligned our state constitutional protections with those protections long afforded by the federal constitution prior to *Harris* and followed by the courts of this state." *State* v. *DeFusco*, 27 Conn. App. 248, 256–57, 606 A.2d 1 (1992), aff'd, 224 Conn. 627, 620 A.2d 746 (1993).

[15] Authorities have disagreed as to whether *Garcetti* narrowed the *Pickering/Connick* test or, instead, merely addressed an issue that it had not previously had the opportunity to address. Compare *Kaye* v. *Board of Trustees*, 179 Cal. App. 4th 48, 58, 101 Cal. Rptr. 3d 456 (2009) ("*Garcetti* does not . . . limit rights established by earlier precedents in a manner inconsistent with those precedents. Rather, *Garcetti* relied upon and applied earlier precedents to address an issue that had never been directly addressed by them . . . ."), with R. Garcia, "Against Legislation: *Garcetti* v. *Ceballos*, and the Paradox of Statutory Protection for Public Employees," 7 First Amend. L. Rev. 22, 24 (2008–2009) (*Garcetti* "narrowed the scope of the [f]irst [a]mendment protections that public employees had enjoyed for decades"). In our view, *Garcetti* narrowed the scope of protected speech. Before *Garcetti* was decided, public employees reasonably could have expected that speech pursuant to their official duties would be protected from employer discipline if it related to a matter of public concern and if it satisfied the *Pickering* balancing test. After *Garcetti*, the "answer to the question whether the [f]irst [a]mendment protects a government employee from discipline based on speech made pursuant to the employee's official duties' . . . is . . . '[n]ever.'" *Garcetti* v. *Ceballos*, supra, 547 U.S. 426 (Stevens, J., dissenting).

[16] Although the second prong of *Geisler* focuses on the decisions of this court and the Appellate Court, it bears noting that, on at least five occasions, our trial courts have either declined to apply *Garcetti* to § 31-51q claims involving the state constitution or held that it is an open question whether *Garcetti* applies to such claims. See *Sanchez* v. *High Watch Recovery Center, Inc.*, Superior Court, judicial district of Hartford, Docket No. HHD-CV-12-6032834-S (January 14, 2013) (denying motion to strike claim pursuant to § 31-51q pursuant to *Garcetti* because "the Connecticut constitution is more liberal than the federal constitution on freedom of speech"); *Maysonet* v. *Primecare, Inc.*, Superior Court, judicial district of Waterbury, Docket No. CV-10-5016091-S (February 1, 2013) (denying defendant's motion for summary judgment "because Connecticut may afford individuals greater protection under its own constitution" than is afforded by *Garcetti*); *Matthews* v. *Dept. of Public Safety*, Superior Court, judicial district of Hartford, Docket No. HHD-CV-11-6019959-S (May 31, 2013) (56 Conn. L. Rptr. 262, 270–82) (conducting *Geisler* analysis and concluding that *Pickering/Connick* balancing test applies to employee speech under Connecticut constitution); *Cubilla* v. *Montville*, Superior Court, judicial district of New London, Docket No. KNL-CV-11-6010874-S (March 18, 2014) (57 Conn. L. Rptr. 860, 864 n.65) (adopting analysis of court in *Matthews*); *Carson* v. *Dept. of Children & Families*, Superior Court, judicial district of Hartford, Docket No. HHD-CV-07-5036578-S (March 27, 2014) (denying motion to strike claim pursuant to § 31-51q pursuant to *Garcetti* because free speech rights may be broader under state constitution); see also *Ozols* v. *Madison*, supra, United States District Court, Docket No. 3:11cv1324 (SRU) (concluding that *Garcetti* does not apply "to those portions of [§] 31-51q that relate to rights protected by the Connecticut [c]onstitution"); but see *Cabrera* v. *American School for the Deaf*, Superior Court, judicial district of Hartford, Docket No. HHD-CV-12-6035273-S (February 26, 2013) (55 Conn. L. Rptr. 637, 639–41) (performing *Geisler* analysis and concluding that *Garcetti* applies to claims under

state constitution).

[17] The court in *Garcetti* stated that "[i]f . . . a government employer is troubled by the perceived anomaly, it has the means at hand to avoid it. A public employer that wishes to encourage its employees to voice concerns privately retains the option of instituting internal policies and procedures that are receptive to employee criticism. Giving employees an internal forum for their speech will discourage them from concluding that the safest avenue of expression is to state their views in public." *Garcetti* v. *Ceballos*, supra, 547 U.S. 424. The court failed to recognize, however, that a public employee who speaks pursuant to such internal policies and procedures still might face the prospect of employer discipline for the speech, unless the policies and procedures rose to the level of a contractual guarantee that there would be no retaliation for critical speech. Moreover, we do not see why this important issue of public policy should be subject to a public employer's unilateral choice.

[18] Compare *Matthews* v. *Lynch*, United States District Court, Docket No. 3:07cv739 (WWE) (D. Conn. April 11, 2011) (speech of state police officer relating to alleged corruption within Connecticut State Police and directed at office of Connecticut attorney general and New York State Police not protected because speaker was "charged with reporting crime and . . . he did in fact report misconduct to the agencies to which he was supposed to report such misconduct").

[19] Indeed, it is arguable that what Justice Souter characterized as an "adjustment" of the *Pickering* test; *Garcetti* v. *Ceballos*, supra, 547 U.S. 434; is not an adjustment at all, but is a straightforward application of *Pickering* to a specific type of speech, that is, speech pursuant to an employee's official duties, that the employer has a particularly important interest in controlling.

Justice Breyer argued in his dissenting opinion in *Garcetti* that the standard adopted by the majority was too narrow, but that Justice Souter's proposed standard was too broad. Id., 446–48. In his view the *Pickering* balancing test should apply to employee speech pursuant to official duties "only in the presence of augmented need for constitutional protection and diminished risk of undue judicial interference with governmental management of the public's affairs." Id., 450. He concluded that that test was met in *Garcetti* because the case involved the speech of an attorney, which is subject to regulation by canons of professional ethics, and because it involved the speech of a prosecutor, which is subject to the constitutional mandate to communicate with the defense about exculpatory and impeachment evidence in the government's possession. Id., 446–47. We believe that Justice Souter's proposed standard provides adequate protection of the interests of public employers.

[20] For example, if a public employee responsible for establishing state traffic rules and policies insisted that, contrary to the state's established policy, the speed limit on interstate highways should be eighty miles per hour, that speech would not be protected under Justice Souter's approach, even though it was on a matter of public concern and placed little burden on the employer.

[21] The California constitution provides in relevant part: "Every person may freely speak, write and publish his or her sentiments on all subjects, being responsible for the abuse of this right. A law may not restrain or abridge liberty of speech or press." Cal. Const., art. I, § 2 (a).

[22] The Maryland constitution provides in relevant part: "That the liberty of the press ought to be inviolably preserved; that every citizen of the [s]tate ought to be allowed to speak, write and publish his sentiments on all subjects, being responsible for the abuse of that privilege." Md. Const., art. 40.

[23] The South Dakota constitution provides in relevant part: "Every person may freely speak, write and publish on all subjects, being responsible for the abuse of that right. . . ." S.D. Const., art. VI, § 5.

[24] In the public workplace, the modified *Pickering/Connick* test also would protect speech regarding deliberately unconstitutional action by the employer because that conduct would satisfy the state action requirement. *Garcetti* v. *Ceballos*, supra, 547 U.S. 435 (Souter, J., dissenting).

[25] The defendants raise the hypothetical examples of an employee who "has a racist bumper sticker on a car that he or she uses when visiting customers," an employee who "hands out political leaflets to customers or solicits donations to social causes," an employee who "hands out religious materials when meeting customers," and an employee who "uses racist or sexist slurs when conducting business or communicating with other employees." Presumably, however, none of these examples involves speech pursuant to official job duties. Thus, if they would be protected under the *Pickering/Connick* balancing test, they would be protected under *Garcetti*,

which is the standard that the defendants would have us adopt under the state constitution. Moreover, although there is no need in the present case to consider whether such speech would be protected under the *Pickering/Connick* test, we doubt that the employee's interest in engaging in such speech would outweigh the employer's legitimate interest in maintaining discipline, harmony and efficiency in the workplace or that the speech would satisfy the statutory requirement that the employee's activity "not substantially or materially interfere with the employee's bona fide job performance or the working relationship between the employee and the employer . . . ." General Statutes § 31-51q. Indeed, a number of these activities would subject the employer to legal action, which would hardly promote a harmonious working relationship between the employee and the employer.

The amicus Connecticut Business and Industry Association, Inc., contends that, in the present case, "not only was [the plaintiff's] speech part of his professional duties, but his speech occurred even after his employer *fully considered* his concerns, and, after *two separate investigations*, disagreed with [the plaintiff] that additional disclosures were necessary." (Emphasis in original.) As we have indicated, however, we have not been asked to apply the standard that we have adopted to the facts of the present case. Accordingly, we express no opinion as to whether the plaintiff's speech was protected under § 31-51q.

[26] As the majority in *Cotto* stated, "[w]e do not dispute the possibility that circumstances may arise when the rights of an employee under § 31-51q may conflict with the employer's own free expression rights. If and when that case does arise, we will be required to resolve any such conflict in light of the particular facts and circumstances then presented." *Cotto* v. *United Technologies Corp.*, supra, 251 Conn. 8 n.5.

[27] The defendants' reliance on *Schumann* in support of their claim to the contrary is misplaced. In *Schumann*, we rejected the plaintiff's claim that applying *Garcetti* to the speech of internal whistleblowers in the private workplace pursuant to § 31-51q would chill such speech, stating that "by its plain language, [§ 31-51q] applies only to constitutionally protected speech . . . ." (Internal quotation marks omitted.) *Schumann* v. *Dianon Systems, Inc.*, supra, 304 Conn. 610 n.21. Thus, we held only that, if the first amendment did *not* protect internal whistleblower speech in a public workplace from employer discipline under *Garcetti*, § 31-51q did not protect such speech from discipline by a private employer in claims involving the first amendment. We did not suggest that, if the speech provisions of the state constitution *do* protect internal whistleblower speech in a public workplace, § 31-51q could not be construed to provide protection to such speech in the private workplace if the protection went beyond that provided by other statutes.